Opinion
 

 TAYLOR, P. J.
 

 Defendants, Guild Industries Corporation (Guild), a Florida corporation, and its officers and directors, M. Byrd, R. Byrd, J. Bass, R. Berman and L. Silverstein (hereafter collectively franchisors) appeal from a judgment entered on a juiy verdict in favor of Spahn, et al. (hereafter collectively franchisees)
 
 [1]
 
 awarding compensatory and punitive
 
 *147
 
 damages on grounds of fraud and violation of the Franchise Investment Law (Corp. Code, § 31000 et seq.), and from the orders denying their motions for judgment notwithstanding the verdict and for new
 
 [2]
 
 The franchisees were granted area franchises to distribute furniture under Guild’s “Baby Butler” trade name,
 
 [3]
 
 by the franchisors’ California agents and intermediaries, Gerry Marcus, the president of Margar Enterprises, Inc. (Marcus/Margar, both nonappealing defendants), for valuable consideration. All of the franchises were unsuccessful and were closed after the franchisees sustained substantial losses. The franchisors now contend that the evidence does not support the verdict, that Marcus/Mar-gar were independent contractors, and that the trial court committed prejudicial error by failing to instruct on all of the elements of fraud. For the reasons set forth below, we have concluded that there is no merit to any of these contentions, and that the judgment in favor of the franchisees must be affirmed.
 

 Viewing the record most strongly in favor of the judgment, as we must, the following pertinent facts appear: Guild manufactures and distributes throughout the United States a complete line of baby furniture, including a high chair substitute called the Baby Butler. Margar Enterprises, Inc. (Margar), a California corporation, was used by Guild to sell franchises and conduct its other business in California. Margar’s president, Geny Marcus (Marcus), was also an employee of Guild with the titles of director of sales and director of marketing. Guild authorized Marcus to establish retail stores and enlist franchisees for the operation of these stores. The franchisees were all solicited by Guild.
 

 Guild’s marketing system was not geared to casual walk-in customers but was based on prospective customers or “leads,” namely, prospective or new parents who had a need for baby furniture. Guild developed and provided the franchisees with several methods for obtaining names of “leads.” For this purpose, Guild supplied forms and information cards to the franchisees. The franchisees were instructed to place these cards and forms at various locations where prospective customers would see them,
 
 *148
 
 e.g., shopping centers, obstetricians’ offices, etc. The prospective customers were induced to provide their names and addresses and other pertinent information by promises of substantial gifts, such as TV sets, chests and sewing machines. The cards were returned to Guild which then forwarded them to the franchisees who then contacted the prospective customers and made appointments for a visit to the stores.
 

 The card distribution methods developed by Guild included: 1) a “ballot box” which was placed in retail stores. Monthly drawings were to be held at each ballot box location, and the gifts were to be given to prospective customers whose names were drawn; 2) a free magazine devoted to subjects of interest to expectant mothers, with titles such as “Welcome Babee” and “Baby Talk,” with attached information cards. The franchisees were to place these magazines in doctors’ offices. These information cards promised that the free gifts would be sent by Guild to those who filled in their names and addresses and returned the cards to Guild in Florida. Guild eventually distributed the cards to the various franchisees, as described above; 3) “TV Boxes,” small cardboard boxes designed to be placed in stores. The cards in the TV Boxes also promised a free gift from Guild as an inducement to prospects to complete the cards.
 

 Each of the above mentioned distribution schemes was inherently fraudulent, as the cards falsely promised that a free gift would be sent to the prospective customers directly by Guild in exchange for simply filling out and returning the cards. Guild never intended to send the promised gifts and did not do so. In some instances, the franchisees gave gifts to prospective customers who called or visited the stores. However, the franchisees were instructed by Marcus to do so
 
 only
 
 when pressed by the customer.
 

 After the completed information cards had been returned to the franchisee, the franchisee was instructed to contact the prospective customer and arrange an appointment for the customer to visit the store. One method provided by Guild for such a contact was a device known as the “Lisa Letter.” The “Lisa Letter” promised the prospective customer a free gift if he called the Baby Butler store and asked for “Lisa.” The franchisee was instructed to answer the telephone as “Lisa” and then arrange an appointment for the customer to see Guild furniture. The fact that franchisees had to pretend they were “Lisa” was particularly offensive to some of them who felt that this was a dishonest method of attracting customers. After a prospective customer succumbed to the Lisa
 
 *149
 
 Letter or other attraction and visited the store, she was confronted with other high pressure sales devices provided to the franchisees by Guild. Most of the devices consisted of graphic materials designed to cajole or scare prospective parents into purchasing Guild furniture.
 

 For example, Guild provided a flip chart that was generally the first sales book shown to a prospective customer. The flip chart displayed pictures of injured or strangled babies who had fallen from, or become entangled in, high chairs, and included newspaper clippings detailing the pain and suffering of injured infants and their parents.
 

 After the flip chart, the prospect was shown a film
 
 [4]
 
 narrated by Bert Parks and supplied by Guild. The film described the Baby Butler; Parks stated that Baby Butler was approved by the Better Business Bureau. Marcus admitted, however, that Baby Butler was not approved by the Better Business Bureau or any other consumer organization. Thus, the film was also a fraudulent sales method.
 

 The fact that Guild was fully aware of and proud of its sales techniques is demonstrated by the letter dated February 11, 1972, written by Berman to Leone, and set forth in its entirety below, except for the opening and closing salutations; Marcus was the “Gerry” referred to by the letter.
 
 [5]
 

 After sales were made, the franchisee accepted a small downpayment and arranged for financing of the purchase either directly by Guild or a finance company.
 

 
 *150
 
 In 1969, Guild hired Marcus, who had been one of its door-to-door salesmen since 1951, to be Guild’s director of sales for certain counties in northern California. Marcus was given a franchise and a letter of authority which indicated that he was empowered by Guild to establish franchises for Guild in California. In addition to the letter, Guild orally conferred actual authority upon Marcus to act as its agent in establishing franchises. Pursuant to this authority, Marcus placed newspaper advertisements for the sale of franchises. Through these advertisements placed by Marcus, six of the eight instant franchisees contacted and met Marcus; as to the remaining two, the newspaper advertisement had been placed by the proprietor of an existing Baby Butler retail outlet who arranged an eventual meeting with Marcus.
 

 When Marcus met with a prospective franchisee, he generally indicated that he had worked for Guild for 15 to 20 years, and was then Guild’s director of marketing for the West Coast, as well as Guild’s regional director for California, Hawaii, Oregon, and several other states. Marcus also gave each prospective franchisee a certain amount of limited information about Guild and indicated that Guild was a highly successful company
 
 [6]
 
 that manufactured a complete line of high quality baby furniture, including Baby Butler.
 

 Although the agreements eventually signed between Margar and the franchisee were subject to all of the requirements of the Franchise Investment Law (Corp. Code, § 31000 et seq., hereafter sometimes referred to as the Act), neither Guild, Marcus nor Margar ever registered any of the instant offerings with the Corporations Commissioner, as required by section 31110 of the Corporations Code.
 
 [7]
 
 Marcus also failed to disclose any of the information required pursuant to section 31111.
 
 [8]
 

 
 *151
 
 Marcus told the franchisee that sales of Baby Butler furniture required a very low pressure sales technique and indicated that prospective customers would be “firm leads” who would already have received a free gift sent directly by Guild from its Florida headquarters. For example, Mrs. Kelso testified that Marcus led her to believe that all advertising costs would be paid by Guild, at least to the extent of securing the “leads.” The franchisees were not told that they would have to pay for the leads.
 

 Marcus also told the franchisee that the Baby Butler stores were highly successful and that they could expect to make a profit of 50 percent of their gross sales. For instance, Marcus told Maines that the profit potential was “unlimited,” and Spahn that he would net $35,000 to $40,000 in the first year of operation. At trial, however, Marcus testified that he knew of only one Baby Butler store that was ever financially successful and that one was located in San Diego. He also admitted that the San Diego Baby Butler store was closed after it was enjoined as a consumer fraud by the California Attorney General.
 

 Pursuant to the franchise agreements, Marcus promised to provide training for each franchisee. No training was ever provided. As an additional inducement to the franchisees to join the Baby Butler family, Marcus promised each couple (except the Maineses) a free trip to Florida to visit the Guild offices and plant after they signed on as franchisees. Marcus also told Mr. Spahn and Mr. Maines individually that he was then seeking partners for Margar Enterprises and that the likelihood was great that each would be selected as a partner.
 

 Some of the franchisees performed rudimentary market studies which consisted largely of talking with apparently knowledgeable friends and acquaintances and examining county birth statistics. However, the main factor that induced each couple to enter into a franchise agreement was their trust in Marcus, personally, and their reliance upon his representations and promises of earning a higher income. Spahn gave up a position in which he earned about $20,000 annually in the expectation of doubling his income. Marcus introduced Spahn to Leone and showed Spahn the store operated by Leone. Marcus, however, did not tell Spahn that the Leone store was for sale. Further, Marcus specifically instructed Spahn not to talk business to Leone as the latter was a negative person and unsuccessful. Upon execution of the agreements, each couple paid Marcus a franchise fee ranging from $1,000 to $2,750.
 

 
 *152
 
 After the agreements had been signed, Marcus selected the store site (except Mr. and Mrs. Maines’, who had purchased an existing store). Emphasis was on avoiding pedestrian traffic, since the business was to come not from walk-in trade but from the leads to be furnished by Guild. Marcus also instructed each couple in the manner of organizing and setting up their store.
 

 After the franchisees had opened their businesses, they discovered that many of the representations made by Marcus in order to induce them to enter the franchise agreements were fraudulent. They found that they rather than Guild were to pay for the advertising materials used to secure leads and that the free gifts which the information cards promised to prospective customers had never been sent. Instead, the gift items were sold by Guild to the franchisees, who were to give them to some of the prospects who visited the stores.
 

 The franchisees also encountered unanticipated costs (e.g., the fees charged by finance companies, freight costs and salaries), which precluded realization of the large profits promised by Marcus. The franchisees found that they could make no profit whatsoever at the retail prices dictated by Marcus. Marcus, however, could not have been surprised since he knew of only one store that was successful for any length of time. Also, he had heard that a Baby Butler store run by Guild in Florida was “not too much of a success.”
 

 Nevertheless, Marcus constantly urged the franchisees to buy a larger inventory. Marcus received a commission whenever an inventory item was shipped to a franchisee. Marcus also told each franchisee that the others were extremely successful. His statements were completely untrue as he was well aware that none of the franchisees were making any profits.
 

 Guild, on the basis of the trial testimony of its president Byrd, attempts to characterize its relationship to Marcus and the franchisees as that of a mere supplier of goods and services. The record, however, indicates that Guild also dealt directly with the franchisees. The overwhelming evidence adduced at the trial indicated that Guild was not only directly involved in but also in control of the manner in which both Marcus and the franchisees did business. As indicated above, Guild supplied the franchisees with the “Baby Butler Bulletin,” the standard operating procedure for Baby Butler stores, which detailed every facet of the business. The bulletin described procedures for the office, telephone,
 
 *153
 
 furniture, equipment procurement, magazines, diaper service, advertising, handling of leads, placement of advertisements, protected territory basis, making appointments, recruiting, advancement of personnel, delivery service, salesmate projectors, gifts, cash reserves, appointments and suggested copy for ads. Franchisees were required to use Guild’s Baby Butler logo. In addition, some of the franchisees were given a sales training seminar by one of Guild’s officers from Florida and were supplied with a marketing plan developed by Guild. In one instance, Guild even provided direct financing of customer purchases. Guild supplied all of the sales tools directly to the franchisees.
 

 Thus, the record fully supports the juiy’s implied finding that as the developer of a marketing scheme which induced reliance on leads and which provided only fraudulent means of generating those leads, Guild was a direct participant and a principal in each and eveiy fraudulent act perpetrated upon the franchisees.
 

 Guild also attempts to characterize Marcus as an independent contractor and purports to deny any connection with his activities. As indicated, Marcus represented himself as Guild’s agent. Uncontroverted evidence indicated that furniture was purchased through Marcus and payments for merchandise were made directly to him by the franchisees. Marcus also furnished the franchisees with such Guild promotional materials as Baby Butler bulletins, Baby Talk magazines and the Bert Parks films and projector sets. When completed information cards were returned by Guild, they were distributed to the franchisees by Marcus. Guild cloaked Marcus with apparent authority of broad scope. Marcus used the Baby Butler logo and Guild wrote letters to each of the franchisees (similar to the letter to Leone quoted above at fn. 5) advising and commanding them to follow Marcus’ directions in the operation of the business.
 

 Further, on several occasions, various officers of Guild communicated directly with the franchisees by mail and by telephone, as well as in person. Thus, Guild’s officers maintained a direct relationship with the franchisees, as well as through Marcus.
 

 Each of the franchisees opened and operated a retail store for the sale of Baby Butler furniture for a period of time and each lost a large sum of money in attempting to operate its store. The Spahns were in business for about two weeks and sustained operating losses totaling $10,386.09, consisting primarily of set-up costs. Mr. Spahn had resigned from his previous employment to enter the Baby Butler business; when it failed,
 
 *154
 
 the Spahns were forced to refinance their home at a cost of $13,337. The Leones kept their store open for approximately three and one-half months and sustained operating losses of $14,534.75. The Maines remained in business for about six months and sustained operating losses of $15,265.35. As the result of financial difficulties, they lost their home through foreclosure and forfeited $7,098.15 in accumulated equity. The Kelsos lasted one year and lost the sum of $15,967.53 before they closed their store. All of those losses were proximately caused by the fraudulent schemes and activities of Guild.
 

 The overwhelming evidence adduced at the trial indicates that Guild was not only directly involved in, but also in control of, the manner in which both Marcus and the franchisees did business. Guild supplied the franchisees with the “Baby Butler Bulletin” (described above), which dealt with virtually every facet of the franchisees’ business. As indicated above, the franchisees were required to use Guild’s Baby Butler logo; some of them received training at a sales seminar conducted by one of Guild’s officers. All of the franchisees were supplied with the marketing schemes devised by Guild and the sales tools. In one instance, Guild even provided direct financing of customer purchases.
 

 Fraud
 

 As to Guild’s contention that the record does not support the verdict on grounds of fraud, we note that the coercion inherent in the franchise business, as well as the type of pressure and degree of control exerted by franchisors over franchisees long has been recognized by both courts and commentators (McCarthy,
 
 Trademark Franchising and Antitrust: The Trouble With Tie-ins
 
 (1970) 58 Cal.L.Rev. 1085).
 

 As Marcus was Guild’s agent, Guild was responsible for his actions. The theoretical basis and scope of the doctrine of respondeat superior were elaborately reviewed in
 
 Rodgers
 
 v.
 
 Kemper Constr. Co.,
 
 50 Cal.App.3d 608 [124 Cal.Rptr. 143], which involved a tortious assault, as follows: “The doctrine, which departs from the normal tort principle that liability follows fault, is an ancient one but its scope and stated rationale have varied widely from period to period. (See 2 Harper & James, The Law of Torts, pp. 1361-1374; Prosser, Torts (4th ed. 1971) pp. 458-459.) It has been aptly stated that ‘Respondeat superior has long been a rule in search of a guiding rationale.’ (Note, 82 Harv.L.Rev. 1568, 1569.) . . .
 

 
 *155
 

 “In some respects this rationale is akin to that underlying the modern doctrine of strict tort liability for defective products.
 
 [Citations.]
 
 ... It is grounded upon ‘a deeply rooted sentiment that a business enterprise cannot justly disclaim responsibility for accidents which may fairly be said to be characteristic of its activities. ’
 
 [Citations.]
 

 “One way to determine whether a risk is inherent in, or created by, an enterprise is to ask whether the actual occurrence was a generally foreseeable consequence of the activity. However, foreseeability’ in this context must be distinguished from foreseeability’ as a test for negligence.
 
 In the latter sense ‘foreseeable’ means a level of probability which would lead a prudent person to take effective precautions
 
 whereas foreseeability’ as a test for respondeat superior merely means that in the context of the particular enterprise an employee’s conduct is not so unusual or startling that it would seem unfair to include the loss resulting from it among other costs of the employer’s business.
 
 [Citations.]
 
 In other words, where the question is one of vicarious liability, the inquiry should be whether the risk was one ‘that may fairly be regarded as typical of or broadly incidental’ to the enterprise undertaken by the employer.
 
 [Citation.]
 

 “. . .
 
 the test for determining whether an employer is vicariously liable for the tortious conduct of his employee is closely related to the test applied in workers’ compensation cases for determining whether an injury arose out of or in the course of employment.
 
 [Citation.]
 
 This must necessarily be so because the theoretical basis for placing the loss on the employer in both the tort and workers’ compensation fields is the allocation of the economic cost of an injury resulting from a risk incident to the enterprise.
 
 [Citations.] Consequently, our high court has on many occasions relied upon workers’ compensation cases in tort cases.” (Pp. 618-619; italics added.)
 

 Rodgers, supra,
 
 50 Cal.App.3d 608, merely elucidates the theory adopted by our Supreme Court in
 
 Hinman
 
 v.
 
 Westinghouse Elec. Co., 2
 
 Cal.3d 956, 959 [88 Cal.Rptr. 188, 471 P.2d 988]. Further, it has long been well established in this state that:
 

 “Liability may also be based on imputed knowledge. Thus, where the principal actually or apparently authorizes representations about a matter related to the agent’s duties, and the agent has knowledge of their falsity, this knowledge may be imputed to the principal, even though the agent is acting adversely.
 
 (See Rest.2d, Agency § 256, Comment d, § 272 et seq.;
 
 supra,
 
 § 146; 3 Am.Jur.2d, Agency § 282; cf.
 
 Pashley
 
 v.
 
 Pac. Elec. Ry. Co.
 
 (1944) 25 C.2d 226, 236, 153 P.2d 325 [notice imputed to prevent running
 
 *156
 
 of statute of limitations].)” (1 Witkin, Summary of Cal. Law (8th ed.) § 177, p. 775; italics partially added.)
 

 “If the principal places the agent in a position to defraud, and the third person relies upon his apparent authority to make the representations, the principal is liable even though the agent is acting for his own purposes.
 
 (Rest.2d, Agency §§ 261, 262, and Appendix, Rep. Notes, pp. 420, 429.).
 
 The theory is that the agent’s position facilitates the consummation of the fraud, in that from the point of view of the third person the transaction seems regular on its face and the agent appears to be acting in the ordinary course of the business confided to him. It is immaterial that the principal receives no benefits from the transaction.”
 
 (1 Witkin, Summary of Cal. Law (8th ed.) § 178, p. 775; italics partially added.)
 

 Thus, an agent’s liability for compensatory and punitive damages may be imputed to even an innocent principal. Such liability is imputed where (a) the agent’s acts were
 
 authorized
 
 by the principal, (b) the agent was
 
 employed
 
 in a managerial capacity and acting within the scope of employment, or (c) the principal
 
 subsequently ratified
 
 the agent’s actions
 
 (Merlo
 
 v.
 
 Standard Life and Acc. Ins. Co.,
 
 59 Cal.App.3d 5, 18 [130 Cal.Rptr. 416];
 
 Hale
 
 v.
 
 Farmers Ins. Exch.,
 
 42 Cal.App.3d 681, 690-691 [117 Cal.Rptr. 146]; Rest.2d Torts, § 909). (2) Here, there can be no question that all of the prerequisites for imputed liability were met. Marcus was given actual authority by the franchise agreement and by a letter of authority to establish franchises and to promote Baby Butler furniture on Guild’s behalf. Obviously, his authority extended to all acts necessaiy to effect the purpose of his agency (Civ. Code, § 2319, subd. 1), and Guild’s liability for Marcus’ acts within the scope of his authority is coextensive with that authority (Civ. Code, § 2330). It cannot be questioned that all of Marcus’ acts were within the scope of his authority, since Guild has admitted that Marcus was authorized to set up franchises. The uncontroverted evidence indicated that all of Marcus’ fraudulent acts detailed above were related to setting up and administering the franchises.
 

 Marcus’ ostensible, authority was established by Guild’s representations as to his status
 
 (Boren
 
 v.
 
 State Personnel Board,
 
 37 Cal.2d 634 [234 P.2d 981];
 
 Hartong v. Partake, Inc., 266
 
 Cal.App.2d 942 [72 Cal.Rptr. 722];
 
 Lee
 
 v.
 
 Helmco, Inc.,
 
 199 Cal.App.2d 820 [19 Cal.Rptr. 413]) and by the course of conduct between the parties
 
 (Tosi
 
 v.
 
 Northern Calif. Bldg. etc. Assn.,
 
 3 Cal.2d 274 [44 P.2d 333]). Here, Guild instructed the franchisees to follow
 
 *157
 
 Marcus’ instructions in writing as well as by the personal contact of its officers with some of the franchisees.
 

 Contrary to Guild’s contentions, the instant record also establishes that Marcus was a managerial employee of Guild. Managerial functions have been defined as directing, controlling, conducting or carrying on his employer’s business “or any part thereof”
 
 (Ciro’s of S. F.
 
 v.
 
 State Bd. of Equalization,
 
 142 Cal.App.2d 636, 639 [299 P.2d 703]). Guild admitted that Marcus was its employee and that the scope of his employment included the establishment of distributorships. The managerial nature of Marcus’ duties arise out of the uncontroverted fact that he was empowered to select his franchisees in any way he saw fit and to deal with them with similar autonomy. Guild’s president Byrd admitted that Marcus was vested with a great deal of discretion in managing the affairs of his franchisees.
 

 Nor can it be questioned that Guild ratified Marcus’ actions as to each of the franchisees. A principal ratifies an agent’s acts when he knows of the acts, and accepts the benefits which flow from them
 
 (Rakestraw
 
 v.
 
 Rodrigues,
 
 8 Cal.3d 67 [104 Cal.Rptr. 57, 500 P.2d 1401];
 
 Common Wealth Insurance Systems, Inc.
 
 v.
 
 Kersten,
 
 40 Cal.App.3d 1014, 1026 [115 Cal.Rptr. 653];
 
 Kuchta
 
 v.
 
 Allied Builders Corp.,
 
 21 Cal.App.3d 541 [98 Cal.Rptr. 588]). Here, Guild admitted that its officers and employees were aware of Marcus’ enlistments of the franchisees. Marcus was in frequent communication with Guild’s officers and asked for and received advice as to how to handle the franchisees. Some of Guild’s officers communicated directly with the franchisees. Guild accepted the benefits of Marcus’ actions each time it sold goods to the franchisees.
 
 [9]
 

 The Franchise Investment Law
 

 Overwhelming evidence also establishes Guild’s liability to the franchisees pursuant to the state’s Franchise Investment Law (Corp. Code, § 31000 et seq.),
 
 [10]
 
 which was adopted for the very purpose of
 
 *158
 
 preventing frauds, such as those perpetrated by Guild on the instant franchisees. Liability is imposed upon Guild by section 31302, which provides: “Every person who directly or indirectly controls a person liable under Section 31300 or 31301, every partner in a firm so liable, every principal executive officer or director of a corporation so liable, every person occupying a similar status or performing similar functions, every employee of a person so liable
 
 who materially aids in the act or transaction constituting the violation, are also liable jointly and severally with and to the same extent as such person,
 
 unless the other person who is so liable had no knowledge of or reasonable grounds to believe in the existence of the facts by reason of which the liability is alleged to exist” (italics added).
 

 Section 31015 defines “person” to include corporations, and sections 31300 and 31301 provide liability for fraudulent statements made in the course of selling or offering franchises for sale—the very acts committed by Marcus.
 

 Where, as here, a violation of the Franchise Investment Law has been established by the franchisees (fraudulent sale of franchises without registration and disclosure as required by §§ 31101 and 31110-31125), the burden of proof was on the individual officers of Guild to prove their exemption from liability by proving lack of knowledge of the acts giving rise to liability
 
 (Eastwood
 
 v.
 
 Froehlich, supra,
 
 60 Cal.App.3d 531). Here, no evidence was adduced to show that Guild’s officers, Berman and Silverstein, who had personal contacts with the franchisees or signed or sent letters or bulletins to them, were not aware of the manner in which Guild and Marcus/Margar conducted its business. Guild’s letter of February 11, 1972, quoted above, at page 149, footnote 5, speaks for itself.
 

 The franchisors argue that no evidence of control of Marcus by Guild was introduced at trial. However, as amply illustrated above, overwhelm
 
 *159
 
 ing evidence showed that Guild controlled the entire Baby Butler business from the standard operating procedure to the promotional materials, to the sales training and marketing plans.
 
 [11]
 

 We turn next to Guild’s contentions concerning the allegedly erroneous instructions to the jury. Guild contends that the punitive damage award was improper as the jury was not instructed as to all the elements of fraud. Guild’s argument that the instruction’s omission of the element of reliance is fatal, is predicated on its assumption that the reliance of the franchisees on Marcus’ representations was not proved.
 

 The record, however, indicates that the jury was instructed as to the elements of fraud pursuant to section 31301, as set forth below.
 
 [12]
 
 That instruction encompassed each and eveiy element of fraud except for the necessity of reliance by the franchisees, on the misrepresentations of the franchisors. The verdict demonstrates that the jury concluded that each and eveiy element of fraud was present. The lack of an essential element in one instruction may often be supplied by others and the whole rendered unobjectionable
 
 (Douglas
 
 v.
 
 Southern Pacific Co.,
 
 203 Cal. 390, 396 [264 P. 237]). Clearly, this occurred here, as we can understand when we read all of the instructions given in the light of the facts adduced.
 

 As indicated above, each of the franchisees adduced ample substantial evidence indicating that when they purchased the franchises from Marcus, they did so in reliance on their belief that his representations were true. No rebuttal evidence was adduced by the franchisors. Consequently, even if the jury had been specifically instructed as to reliance, they could only have found that the franchisees relied on the representations of Marcus, an agent, as well as a managerial officer of Guild.
 

 
 *160
 
 Although the jury had no opportunity to make a finding as to reliance, the court’s instructions stated that the franchisors were not liable if they could prove that the franchisees knew “the facts concerning the untruth” of Marcus’ statements (Corp. Code, §§ 31300-31301). The uncontroverted evidence indicated that each of the franchisees was inexperienced in the baby furniture business. In finding the franchisors liable, the jury found that the franchisees were unaware of the lies told. Thus, the franchisees’ lack of awareness of the falsity of Marcus’ and the Guild officers’ statements is the substantial equivalent of “reliance” as an element of fraud.
 

 The test for reversal for error in instructions is whether, absent the error, it is reasonably probable that the jury would have returned a verdict more favorable to the appellant
 
 (People
 
 v.
 
 Berry,
 
 18 Cal.3d 509, 518 [134 Cal.Rptr. 415, 556 P.2d 777];
 
 People
 
 v.
 
 Duran,
 
 16 Cal.3d 282, 295 [127 Cal.Rptr. 618, 545 P.2d 1322, 90 A.L.R.3d 1];
 
 People
 
 v.
 
 Watson,
 
 46 Cal.2d 818, 836 [299 P.2d 243]). Given the record before us and assuming the most comprehensive instruction on reliance, there is no possibility that the jury could have returned a verdict favorable to the franchisors. No evidence contradicted the franchisees’ reliance on Marcus. Error is not reversible if it was not likely to mislead the jury
 
 (Nunneley
 
 v.
 
 Edgar Hotel,
 
 36 Cal.2d 493, 500 [225 P.2d 497]; 4 Witkin, Cal. Procedure (2d ed.) Trial, § 242, pp. 3056-3057).
 

 The record also indicates that the franchisors waived any claim that incomplete instructions were given, as no objection was made at trial. There can be no question that fraud and violation of the Franchise Investment Law were the major issues in the instant case, as they were pled in the complaint, raised in the franchisees’ trial memorandum filed prior to trial and argued at trial in the franchisees’ closing argument.
 

 In order to complain of failure to instruct on a particular issue, the aggrieved party must request the specific proper instruction
 
 (Switzer
 
 v.
 
 State of California,
 
 269 Cal.App.2d
 
 621
 
 [75 Cal.Rptr. 731]). As the record here indicates that the franchisors made no such request, failure to object at trial constitutes a waiver
 
 (Valentine
 
 v.
 
 Kaiser Foundation Hospitals,
 
 194 Cal.App.2d 282 [15 Cal.Rptr. 26]).
 

 
 *161
 
 The judgment and the order denying the motion for judgment notwithstanding the verdict are affirmed. The purported appeal from the order denying the franchisors’ motion for a new trial is dismissed.
 

 Kane, J., and Rouse, J., concurred.
 

 [1]
 

 The original plaintiffs and individual franchisees were all middle-aged couples, the Spahns, Leones, Maines and Kelsos, who had purchased area franchises from Guild in 1971 and 1972 through Marcus and Margar. Each couple purchased and operated its franchise independently of the others. During the course of this action, Mr. Kelso and Mr. Leone died and their widows continued the action in their respective individual and representative capacities. The record indicates that the franchisees initially cross-appealed
 
 *147
 
 from a portion of the judgment pertaining to attorney fees but subsequently abandoned the cross-appeal.
 

 [2]
 

 The order denying the franchisors’ motion for a judgment notwithstanding the verdict is separately appealable (Code Civ. Proc., § 904.1, subd. (d)); the order denying the franchisors’ motion for a new trial is not appealable; accordingly, that purported appeal must be dismissed.
 

 [3]
 

 Baby Butler was initially also named as a defendant but the matter was dismissed as to Baby Butler after the evidence indicated that Baby Butler was only a trade name and not a separate entity.
 

 [4]
 

 The record indicates that the jury viewed the film.
 

 [5]
 

 “I am sorry to be so long in writing you but I have been very busy. [¶] When I spoke to you and Gerry the other day, I became very concerned over the fact that you do not have the grasp of this business that you should have by now. [¶] Guild Industries has been selling Baby Butler products for a quarter of a century and there is very little that can be added or changed that will improve our procedure or presentation. Deviation in our business means failure. I have never seen it fail. [¶]
 
 You must follow the procedures that Gerry has outlined concerning every part of your business if you expect to succeed.
 
 [¶]
 
 A good example of what I mean is the standard sales pitch using our flip-chart presentation book.
 
 This book, followed from start to finish, provides everything that a salesperson needs—a beginning, a middle, and an end. [¶]
 
 We sell our furniture using a scare psychology. This pitch has that.
 
 We sell our furniture because it has value. This pitch demonstrates that.
 
 We sell our furniture because we give our customer a reason for buying it. With our bonus of a chest or a sewing machine, or even cash, we provide that.
 
 [¶] If you are not showing these major ingredients to the customer, then you will not make a sales. The difference between a success and a failure in our business is seeing as many people as possible and being a strong closer. Without that, you have nothing going for you except a bookful of unkept promises. [¶] I urge you to follow Gerry’s instructions on your closing procedure. You have all that it takes to make a success.” (Italics added.)
 

 [6]
 

 For example, Marcus told the Spahns that Guild annually sold 85,000-90,000 units and grossed a little under $5 million in sales.
 

 [7]
 

 “On and after April 15, 1971,
 
 it shall be unlawful for any person to offer or sell any franchise in this state unless the offer of the franchise has been registered under this part
 
 or exempted under Chapter 1 (commencing with Section 31100) of this part.” (Italics added.)
 

 [8]
 

 This section of the Act expressly sets forth certain specified items of information that must be provided. Thus, subdivision (f) requires the length of time the franchisor has (1) conducted a business of the type to be operated; (2) granted franchises for such a business; and (3) granted franchises in other lines of business; subdivision (g) requires a recent financial statement of the franchisor; subdivisions (i) and (j), a statement of the franchise and other fees charged; subdivision (p), a statement of established or projected earnings; subdivision (r), the number of franchises presently operating and proposed to be sold.
 

 [9]
 

 Thus, Guild’s officers and directors are individually liable to the franchisees. The franchisors have repeatedly misconstrued the provision of individual liability for fraud under section 31302 of the Corporations Code, as well as the holding of
 
 Eastwood
 
 v.
 
 Froehlich,
 
 60 Cal.App.3d 523 [131 Cal.Rptr. 577], which held only that lack of knowledge of a violation (an exception to liability) is an
 
 affirmative defense.
 
 The record indicates that the franchisors here neither pled nor proved such an affirmative defense.
 

 [10]
 

 The statute was added by Statutes of 1970, chapter 1400, and became operative on January 1, 1971. Section 31001 provides:
 
 “The Legislature hereby finds and declares that the widespread sale of franchises is a relatively new form of business which has created
 
 
 *158
 

 numerous problems both from an investment and a business point of view in the State of California.
 
 Prior to the enactment of this division, the sale of franchises was regulated only to the limited extent to which the Corporate Securities Law of 1968 applied to such transactions.
 
 California franchisees have suffered substantial losses where the franchisor or his representative has not provided full and complete information regarding the franchisor-franchisee relationship,
 
 the details of the contract between franchisor and franchisee, and the prior business experience of the franchisor.
 
 “It is the intent of this law to provide each prospective franchisee with the information necessary to make an intelligent decision regarding franchises being offered. Further, it is the intent of this law to prohibit the sale of franchises where such sale would lead to fraud
 
 or a likelihood that the franchisor’s promises would not be fulfilled, and to protect the franchisor by providing a better understanding of the relationship between the franchisor and franchisee with regard to their business relationship.” (Italics added.)
 

 [11]
 

 In any event, Guild’s control of Marcus is irrelevant to Guild’s liability pursuant to the Act. Guild was liable as principal for the actions of its agent Marcus under the imputed liability provision quoted above. Section 31302 is identical to the imputed liability provision of the Securities Law (Corp. Code, § 25504) imputing liability to a principal
 
 regardless
 
 of whether the actual perpetrator of the violation is under the control of the principal or is merely an agent
 
 (Previte
 
 v.
 
 Lincolnwood, Inc.,
 
 48 Cal.App.3d 976, 985 (122 Cal.Rptr. 194]).
 

 [12]
 

 “Any person who offers or sells a franchise in violation of the Franchise Investment Law shall be liable to the franchisee for damages caused thereby unless a defendant proves that the plaintiff knew the facts concerning the untruth or omission or that the defendant exercised reasonable care and did not know, or if he had exercised reasonable care would not have known of the untruth of the admissions.”