[No. B020292. Second Dist., Div. One. Dec. 7, 1989.]

CONTINENTAL AIRLINES, INC., Plaintiff and Respondent, v. McDONNELL DOUGLAS CORPORATION, Defendant and Appellant.

390

**Counsel**

Hufstedler, Miller, Carlson & Beardsley, Seth M. Hufstedler, Otto M. Kaus, Bryan, Cave, McPheeters & McRoberts, Thomas C. Walsh, Dennis E. O'Connell and Steven L. Hogan for Defendant and Appellant.

Sheppard, Mullin, Richter & Hampton, Gregory A. Long, Lisa A. Popovich, Robert Don Lohbeck, Bryan A. Merryman, Parker, Milliken, O'Hara & Samuelian and Brenton F. Goodrich for Plaintiff and Respondent.

## OPINION

### HOFFMAN, J.*—

#### INTRODUCTION AND PROCEDURAL HISTORY

This action was commenced by plaintiff and respondent Continental Airlines, Inc. (Continental), in the Los Angeles Superior Court on December 3, 1979, and alleged, against defendant and appellant McDonnell Douglas Corporation (Douglas), causes of action for negligence, strict liability, deceit, breach of warranty and breach of contract.

In 1980, Douglas filed a complaint in the federal court seeking a declaration that the exculpatory provision of Article 12 of its Purchase Agreement with Continental was valid and barred Continental's action. Continental counterclaimed, raising essentially the same claims presented in its state court lawsuit.

In early 1985, the federal court granted a partial summary judgment in favor of Douglas, confirming the validity of the contract's exculpatory clause. The court's ruling, which was made final, foreclosed Continental's state claims based on negligence, strict liability and implied warranty under principles of res judicata.[1] However, the federal court stated it made no ruling with regard to Continental's claims for breach of the contract's Warranty nor its Service Life Policy, since they were not properly presented in the motion.

The trial in the superior court began on September 26, 1985, on Continental's fraud, breach of express warranty and breach of contract (the Service Life Policy) claims. At the conclusion of plaintiff's case, a nonsuit motion was made by Douglas; it was later granted only with respect to the breach of warranty cause of action.

The case was submitted to the jury on five different fraud theories and one breach of contract theory, based on the Service Life Policy. On January 30, 1986, the jury returned verdicts in favor of Continental for $17 million on its claims for (1) fraud by misrepresentation, (2) fraud by nondisclosure of known facts and (3) negligent misrepresentation. The jury returned verdicts in favor of Douglas on Continental's claims for (1) fraud by concealment and, (2) fraud by making a promise without intent to perform. On the

---

* Assigned by the Chairperson of the Judicial Council.

[1] On appeal, the Ninth Circuit affirmed the district court's rulings on these issues. (See *Continental Airlines* v. *Goodyear Tire & Rubber Co.* (9th Cir. 1987) 819 F.2d 1519.)

breach of the Service Life Policy claim, the jury awarded Continental damages of $13.4 million.

On March 19, 1986, the trial court denied Douglas's motions for new trial and judgment notwithstanding the verdict. In response to the jury's determination that prejudgment interest was appropriate, the trial court awarded Continental interest at the rate of 7 percent from March 1, 1978, to January 1, 1983, and at 10 percent thereafter, on the fraud and breach of contract awards. Judgment was granted on the higher fraud award and, alternatively, on the breach of contract award, in the event the fraud verdicts did not withstand an appeal.

This appeal is from that judgment.[2] We affirm the judgment as modified.

### STATEMENT OF FACTS

On March 1, 1978, a Continental DC-10 aircraft, which had been delivered to Continental by Douglas in 1972, was in its takeoff roll at Los Angeles International Airport when two tires burst on the left landing gear. The captain elected to try to stop the plane, but it ran off the end of the runway at 85 miles per hour. The landing gear broke through the tarmac, burrowed into the ground, and was ripped from the wing, making a 3.7 foot hole which allowed fuel to pour from the wing fuel tanks. The plane was severely damaged by the resulting fire and rendered unrepairable.

Douglas had approached Continental in 1968 to sell Continental DC-10 aircraft. Douglas used a series of briefings and sales brochures in its sales campaign. The sales brochures given to Continental consisted of hundreds of pages of technical information drafted by Douglas's engineers, and reviewed by its top management, for the express purpose of explaining the DC-10 design and a "Detail Type Specification" (Detail Specification or Specification) to potential aircraft purchasers. That Specification, as its name implies, described the technical details of the DC-10. The briefings, the question and answer period following, and the brochures, were intended by Douglas to constitute Continental's review of the DC-10 specifications.

The Douglas briefings covered the landing gear and wing design, as did many of its brochures. Continental personnel used the brochures to write portions of Continental's "Tri-Jet Evaluation," a comparison between the

---

[2] Continental's purported "cross-appeal" from the judgment was dismissed since it was not a party "aggrieved" by the judgment. (*Cicinelli* v. *Iwasaki* (1959) 170 Cal.App.2d 58, 64 [338 P.2d 1005]; 9 Witkin, Cal. Procedure (3d ed. 1985) Appeal, § 142, pp. 151-152.)

DC-10 and Lockheed's L-1011, which became a basis for Continental's decision to purchase the DC-10.

The brochures contained statements that "[t]he fuel tank will not rupture under crash load conditions"; that the landing gear "are designed for wipe-off without rupturing the wing fuel tank"; that "the support structure is designed to a higher strength than the gear to prevent fuel tank rupture due to an accidental landing gear overload"; that the DC-10 "is designed and tested for crashworthiness"; that the "landing gear will be tested" to demonstrate the fail safe integrity and wipe-off characteristics of the gear design; and that "good reliability" for the DC-10 landing gear could be predicted with an "unusually high degree of confidence" because of its close similarity to the successful design on the DC-8 and DC-9 aircraft.

When Continental decided to purchase the DC-10, instead of the L-1011 aircraft, it finalized a Purchase Agreement with Douglas which contained an integration clause and incorporated by reference the Detail Specification for the DC-10. In contrast to the absolute guarantees of the brochures, the Detail Specification used qualified language on the subject of the landing gear breakaway characteristic. It recited, in relevant part, that the landing gear "shall be designed" so that, under certain specified load conditions, failure of the landing gear "is not likely" to rupture the wing fuel tanks or fuel lines. That clause, its interpretation, and the precontract representations which varied the terms of the Specification, became the focus of the instant trial.

## CONTENTIONS

I. Douglas contends with respect to Continental's fraud claims that:

A. Continental's negligent misrepresentation claim was barred by the exculpatory clause of the Purchase Agreement.

B. The jury instruction on fraud by "failure to disclose" was incomplete in two vital particulars.

C. The trial court prejudicially erred in refusing to admit the "Six Bulletin."

D. The trial court prejudicially erred in admitting the "Starlof Letter" and the evidence associated with it.

E. The trial court prejudicially erred in refusing to permit Douglas's expert witness McCarthy to testify from documents prepared by his subordinates.

F. The trial court prejudicially erred in permitting the contractual term of the Detail Specification to be varied, amplified and supplemented by parol evidence.

G. There was no substantial evidence of fraud: (1) the Detail Specification was not false, and (2) precontract promotional materials cannot form the basis of a fraud claim.

H. There was no substantial evidence that Douglas's misrepresentations were material or that Continental reasonably relied on them in deciding to purchase the DC-10.

I. The trial court's treatment of the Service Life Policy issues prejudiced the entire case.

J. The trial court erroneously instructed the jury on the measure of damages for fraud.

K. The trial court erred in awarding prejudgment interest at 10 percent.

II. Douglas contends Continental's claim for breach of contract under the Service Life Policy was submitted to the jury in error because:

A. The value of the aircraft cannot be recovered under the Service Life Policy.

B. Continental never "triggered" the policy by giving the required notice.

C. Continental's insurer had no standing to make a claim under the policy since it is nonassignable.

DISCUSSION

I. *The Fraud Claims*

A. Continental's Cause of Action For Negligent Misrepresentation Was Not Barred by the Exculpatory Clause of the Contract.

Douglas contends Continental's claim for negligent misrepresentation was barred by Article 12 of the Purchase Agreement wherein Continental expressly agreed to waive all claims for negligence. Although the cause of action was submitted in accordance with BAJI No. 12.45, which is

entitled "Fraud and Deceit—Negligent Misrepresentation," on the instruction given to the jury, the court changed the name of the tort to "fraud and deceit by representation *without reasonable grounds.*"

While Douglas makes much ado about this name change, the real question presented is whether negligent misrepresentation is a species of fraud which, pursuant to California statutory and case law, may not be waived by an exculpatory clause.

■ The elements of a cause of action for negligent misrepresentation are: "1. The defendant must have made a representation as to a past or existing material fact. [¶] 2. The representation must have been untrue; [¶] 3. Regardless of his actual belief the defendant must have made the representation *without any reasonable ground for believing it to be true*; [¶] 4. The representation must have been made with the intent to induce plaintiff to rely upon it; [¶] 5. The plaintiff must have been unaware of the falsity of the representation; he must have acted in reliance upon the truth of the representation and he must have been justified in relying upon the representation. [¶] 6. And, finally, as a result of his reliance upon the truth of the representation, the plaintiff must have sustained damage." (BAJI No. 12.45, italics added; see *Walters* v. *Marler* (1978) 83 Cal.App.3d 1, 17 [147 Cal.Rptr. 655], overruled on another ground in *Gray* v. *Don Miller & Associates, Inc.* (1984) 35 Cal.3d 498, 505-507 [198 Cal.Rptr. 551, 674 P.2d 253, 44 A.L.R.4th 763].)

■ Section 1668 of the Civil Code declares unlawful as against public policy "[a]ll contracts which have for their object, directly or indirectly, to exempt any one from responsibility for his own *fraud,* or willful injury to the person or property of another, *or violation of law, whether willful or negligent . . . .*" (Italics added.)

Section 1710, subdivision 2, defines one form of *deceit* as: "The assertion, as a fact, of that which is not true, *by one who has no reasonable ground for believing it to be true.*" (Italics added.)

Section 1572, subdivision 2, provides that *actual fraud* includes the following act: "The positive assertion, *in a manner not warranted by the information of the person making it,* of that which is not true, though he believes it to be true." (Italics added.)

Douglas argues that since section 1668 does not list "misrepresentation" among the kinds of conduct for which a party may not exculpate itself, coupled with the fact that the word "fraud" is not modified, whereas the modifier "willful or negligent" expressly applies only to the phrase

"violation of law," that confirms that "fraud" is used in section 1668 in its traditional sense as an intentional tort.

Douglas's argument is disingenuous. However, Douglas's assertion, that Continental's claim for negligent misrepresentation was barred by the exculpatory clause of the contract, is bolstered by the erroneous holding of *Tokio Marine & Fire Ins.* v. *McDonnell Douglas Corp.* (2d Cir. 1980) 617 F.2d 936, in which the federal court, construing an almost identical exculpatory clause, declared that "[w]here there has been no violation of law, negligent misrepresentations in a commercial transaction such as that involved herein do not fall within the provisions of § 1668." (*Id.* at p. 940.) The cases on which the *Tokio Marine* court relied for that incorrect statement of California law (*Delta Air Lines, Inc.* v. *Douglas Aircraft Co.* (1965) 238 Cal.App.2d 95, 105-106 [47 Cal.Rptr. 518]; *Werner* v. *Knoll* (1948) 89 Cal.App.2d 474, 475-477 [201 P.2d 45]) do not support its conclusion.

The *Werner* case involved a wrongful death action. The court held that lawsuit was barred by the exculpatory clause of the parties' agreement, since contracts relieving individuals from the results of their own *ordinary negligence* are not invalid under section 1668 for contravening public policy. (89 Cal.App.2d at pp. 475-476.) The *Delta Air Lines* case concerned an action for breach of warranty. The court determined the exculpatory clause was valid and covered not only contractual warranty liability but also tort liability. (238 Cal.App.2d at p. 101.) It further held the clause was not void as an attempt to exempt defendant from liability for an express violation of law because defendant's complained-of acts did not constitute such violation. (*Id.* at pp. 105-106.) Neither of these cases involved a cause of action for negligent misrepresentation.

We have found no other case which interprets the relationship amongst sections 1668, 1710, subdivision 2, and 1572, subdivision 2, in this context, although all of these sections were enacted in 1872 as part of the original Civil Code.[3]

The case law, however, is clear that in California negligent misrepresentation is a form of fraud and deceit under sections 1710, subdivision 2, and 1572, subdivision 2. Thus, in *Andrepont* v. *Meeker* (1984) 158 Cal.App.3d 878, at page 884 [204 Cal.Rptr. 887], the court observed: "Since *Gagne* v. *Bertran* (1954) 43 Cal.2d 481, 487-488 [ ], was decided, California courts have recognized that a negligent misrepresentation is actionable as a form of deceit. [Citing to and quoting §§ 1710, subd. 2, and 1572, subd. 2.]" In *Gold*

---

[3] None of the sections has ever been amended.

v. *Los Angeles Democratic League* (1975) 49 Cal.App.3d 365, at pages 373-374 [122 Cal.Rptr. 732], the court declared: "Negligent misrepresentation is a form of 'actual fraud.' (Civ. Code, §§ 1572, subd. 2, 1710, subd. 2; *Gagne v. Bertran* (1954) 43 Cal.2d 481, 487, fn. 4 [ ]; *Clar* v. *Board of Trade* (1958) 164 Cal.App.2d 636, 644 [ ] . . . .)" In *In re Cheryl E.* (1984) 161 Cal.App.3d 587, at page 599 [207 Cal.Rptr. 728], the court stated: "[N]o actual intent to defraud . . . need be shown, as fraud includes not only intentional misrepresentations but also negligent misrepresentations. (*Balfour, Guthrie & Co.* v. *Hansen* (1964) 227 Cal.App.2d 173, 192 [ ].) Thus, 'scienter' is not an element of every cause of action for deceit. (*Hale* v. *George A. Hormel & Co.* (1975) 48 Cal.App.3d 73, 84 [ ].)" In *Chavez* v. *Citizens for a Fair Farm Labor Law* (1978) 84 Cal.App.3d 77, at page 80, footnote 4 [148 Cal.Rptr. 278], the court noted that "[i]n order to state a cause of action for fraud, a plaintiff must allege (1) a false representation of a material fact, (2) made recklessly or without reasonable ground for believing its truth . . . . (*Gonsalves* v. *Hodgson* [1951] 38 Cal.2d 91, 100-101 [ ].)" (See also 5 Witkin, Summary of Cal. Law (9th ed. 1988) Torts, § 722, p. 821; 5 Witkin, Cal. Procedure (3d ed. 1985) Pleading, § 676, pp. 126-127.)

Under the weight of these authorities, we hold that a cause of action for negligent misrepresentation is included within the meaning of the word "fraud" in section 1668. Therefore, the exculpatory clause of the parties' contract in Article 12, wherein Continental agreed to waive all claims for negligence, was not a bar to Continental's claim for negligent misrepresentation.

### B. The Court's Instruction on Fraud by Nondisclosure Constituted Prejudicial Error.

█ Douglas contends the court's instruction on fraud by nondisclosure constituted prejudicial error. Specifically, it argues the two instructions relating to nondisclosure erroneously omitted any reference to the necessary intent and reliance elements of that claim.

█ In *Lingsch* v. *Savage* (1963) 213 Cal.App.2d 729 [29 Cal.Rptr. 201], the court set forth the components of a nondisclosure cause of action as follows: "(1) Nondisclosure by the defendant of facts materially affecting the value or desirability of the property; (2) Defendant's knowledge of such facts and of their being unknown to or beyond the reach of the plaintiff; (3) *Defendant's intention to induce action by the plaintiff;* (4) *Inducement of the plaintiff to act by reason of the nondisclosure* and (5) Resulting damages." (*Id.* at p. 738, italics added; see *County of Mariposa* v. *Yosemite West*

*Associates* (1988) 202 Cal.App.3d 791, 812 [248 Cal.Rptr. 778]; *Barnhouse* v. *City of Pinole* (1982) 133 Cal.App.3d 171, 190, fn. 7 [183 Cal.Rptr. 881].)

■ In the instant case, the court instructed the jury on five kinds of fraud—intentional, concealment, nondisclosure, false promise, and negligence—all derived from essentially the same operative facts. It actually instructed the jury twice, the first time when it informed the jury on the issues on which Continental had the burden of proof and a second time when it formally listed the elements of each theory. None of the instructions purported to cover more than one species of fraud. In other words, none can be interpreted to apply to any cause of action other than the specific one for which it was given. ■ ■■ ■ ■ Eight of the ten instructions correctly informed the jury that fraudulent intent as well as reliance are elements of the cause of action to which the instruction referred.[4] However, the two instructions relating to nondisclosure omitted any reference whatever to intent and reliance.

The first instruction, which relates to burden of proof, reads as follows: "As to fraud and deceit by nondisclosure of known facts: [¶] 1. That the defendant failed to disclose to Continental a material fact known to McDonnell Douglas and not known to Continental; and [¶] 2. That McDonnell Douglas knew of material facts and also knew that such facts were neither known nor readily accessible to the other party; [¶] 3. That as a legal cause of the fraud and deceit Continental sustained damages; [¶] 4. The nature and extent of plaintiff's damages and the amount thereof."

The second instruction, which defines the elements of the tort, was similarly defective. It reads: "The essential elements of fraud and deceit by failing to disclose known facts, each of which must be proved to recover damages under this theory are: [¶] Except as you may otherwise be instructed, where material facts are known to one party and not to the other, failure to disclose them is not actionable fraud unless there is some relationship between the parties which gives rise to a duty to disclose such known facts. [¶] A duty to disclose known facts arises where one party knows of material facts and also knows that such facts are neither known nor readily accessible to the other party."

In his closing argument, when explaining intentional fraud and fraud by concealment to the jury, Continental's counsel used the court's proposed instructions for guidance and covered all the elements of the claims, includ-

---

[4]In the instruction for negligent misrepresentation, the necessary intent was properly defined as the intent to induce plaintiff to rely on a representation made without reasonable ground for believing it to be true. (See *Walters* v. *Marler, supra,* 83 Cal.App.3d at p. 17.)

ing intent and reliance. But when he turned to nondisclosure, apparently still using the court's instructions, he failed even then to inform the jury of the elements of that cause of action.[5] Thus, the jury's findings against Douglas on the issue of nondisclosure did not include a finding of fraudulent intent nor of reliance.

Moreover, Continental can find no assistance in the jury's answers to the special interrogatories on the nondisclosure cause of action, since the jury simply found that "each of the elements of fraud and deceit by nondisclosure of known facts, *as defined in the court's instruction*" had been proved. (Italics added.) And, because each instruction specifically covered only one species of fraud, even when we consider the instructions as a whole, the error is not cured. (Compare, *Pacific-Southern Mortgage Trust Co.* v. *Insurance Co. of North America* (1985) 166 Cal.App.3d 703, 714-715 [212 Cal.Rptr. 754]; *Little* v. *Stuyvesant Life Ins. Co.* (1977) 67 Cal.App.3d 451, 464-465 [136 Cal.Rptr. 653].)

Continental, relying on *Spahn* v. *Guild Industries Corp.* (1979) 94 Cal.App.3d 143, 160 [156 Cal.Rptr. 375], argues that, inasmuch as Douglas did not request a "specific proper" instruction, it cannot complain on appeal that the instruction was defective. Continental's argument embodies a once common misapprehension concerning the impact of Code of Civil Procedure section 647, which obviates the need to object to an order "giving an instruction, refusing to give an instruction, or modifying an instruction requested . . . ." ■ The matter was clarified by the Supreme Court in *Agarwal* v. *Johnson* (1979) 25 Cal.3d 932, 948-949 [160 Cal.Rptr. 141, 603 P.2d 58], decided six months after *Spahn*. The court, reconciling apparently divergent cases, ultimately quoted with approval from *Rivera* v. *Parma* (1960) 54 Cal.2d 313, at page 316 [5 Cal.Rptr. 665, 353 P.2d 273], as follows: " ' "To hold that it is the duty of a party to correct the errors of his adversary's instructions . . . would be in contravention of section 647, Code of Civil Procedure, which gives a party an exception to instructions that are given . . . . While the exception will be of no avail where an instruction states the law correctly but is 'deficient merely by reason of

[5] Counsel argued to the jury: "In order to recover under that theory, we need to prove that McDonnell Douglas failed to disclose to Continental a material fact, always has to be a material fact. Can't be 'tomorrow it is going to rain.' It has to be something more important that we would rely on, and we have to prove that Douglas knew that there were material facts, and knew that we didn't know about them, that Continental didn't know the facts, and that Continental did not have ready access to those facts, so if we can prove that Douglas knew that Continental didn't have all the facts and that Douglas had all the facts and they didn't tell us, and that [were] material, something that we did, then they're guilty of fraud and deceit by reason of nondisclosure of known facts, and again, obviously, we have to prove that that resulted in damages."

generality,' in other cases he will not be foreclosed from claiming error and prejudice." ' " (*Agarwal, supra,* 25 Cal.3d at p. 949; see *Enis* v. *Specialty Auto Sales* (1978) 83 Cal.App.3d 928, 939-940 [148 Cal.Rptr. 255]; see also *Tannehill* v. *Finch* (1986) 188 Cal.App.3d 224, 227, fn. 3 [232 Cal.Rptr. 749]; *Pappert* v. *San Diego Gas & Electric Co.* (1982) 137 Cal.App.3d 205, 212 [186 Cal.Rptr. 847].)

■ Continental also relies on *Spahn* v. *Guild Industries Corp., supra,* 94 Cal.App.3d 143, for the proposition that the omission of the reliance element from the instruction was not prejudicial. In *Spahn,* the verdict was saved because the evidence of reliance was so compelling the court found that "even if the jury had been specifically instructed as to reliance, they could only have found that the franchisees relied on the misrepresentations . . . ." (*Id.* at p. 159.) Further, the court observed that "[g]iven the record . . . and assuming the most comprehensive instruction on reliance, there is no possibility that the jury could have returned a verdict favorable to the franchisors." (*Id.* at p. 160.)

*Spahn* is distinguishable. In *Spahn,* only one element necessary to be proved—reliance—was omitted from the instruction, whereas here, the intent element was also omitted. Moreover, we cannot say in this case, as did the court in *Spahn,* that there "is no possibility" (94 Cal.App.3d at p. 160) the jury would have returned a verdict more favorable to Douglas on Continental's nondisclosure claim absent these errors.

On the contrary, it appears probable the defect in the nondisclosure instructions did affect the verdict. We reach this conclusion because, when the jury was correctly instructed as to all the elements of fraud by *concealment,* it found in favor of Douglas. It did so although none of the instructions were specific as to the facts and Continental's counsel made no attempt in his argument to distinguish the facts upon which Continental based its claims, instead discussing the same matters purportedly concealed, or not disclosed, interchangeably without reference to specific instructions or theories.

■ In making our determination whether the defective instructions constituted reversible error, we are guided by the language of our Supreme Court in *Henderson* v. *Harnischfeger Corp.* (1974) 12 Cal.3d 663 [117 Cal.Rptr. 1, 527 P.2d 353], wherein the court stated: "Generally speaking if it appears that error in giving an improper instruction was likely to mislead the jury and thus to become a factor in its verdict, it is prejudicial and ground for reversal. [Citation.] To put it another way, '[w]here it seems probable that the jury's verdict may have been based on the erroneous

instruction prejudice appears and this court "should not speculate upon the basis of the verdict." ' [Citations.] . . . 'The determination whether, in a specific instance, the probable effect of the instruction has been to mislead the jury and whether the error has been prejudicial so as to require reversal depends on all the circumstances of the case, including the evidence and the other instructions given. No precise formula can be drawn.' [Citations.]" (*Id.* at pp. 670-671; *Frantz* v. *San Luis Medical Clinic* (1978) 81 Cal.App.3d 34, 47 [146 Cal.Rptr. 146].)

■ From our examination of the entire record, including the evidence and the other instructions, we can only conclude the court's error in instructing the jury on fraud by nondisclosure misled the jury, was prejudicial and resulted in a miscarriage of justice; therefore, the judgment cannot stand to the extent it is based on the fraud by nondisclosure verdict. (Cal. Const., art. VI, § 13; *Henderson* v. *Harnischfeger Corp., supra,* 12 Cal.3d at pp. 670, 674; see *Seaman's Direct Buying Service, Inc.* v. *Standard Oil Co.* (1984) 36 Cal.3d 752, 771, 774 [206 Cal.Rptr. 354, 686 P.2d 1158].) However, as we discuss later in this opinion, the judgment can be upheld based on the intentional fraud and negligent misrepresentation verdicts.

## C. The Robert Six Bulletin Was Properly Excluded.

Douglas made numerous unsuccessful attempts at trial to introduce into evidence a December 1979 written statement which was issued to all Continental employees by Robert F. Six, then chairman of the board and chief executive officer of Continental. The statement informed them that a group of insurance companies retained by Continental had filed a lawsuit against Douglas and others; that insurance companies customarily file such suits in the name of the client to whom they have paid benefits; that Continental was in fact not suing Douglas and had not been asked to participate in the preparation of the lawsuit.

The bulletin concluded with the following sentence: "We continue to feel that the DC-10, which we have been flying throughout our system since 1972, is an excellent airplane—safe, efficient, hardy and responsive."

■ Douglas contends the bulletin should have been admitted into evidence because of "its obvious status as an admission" (Evid. Code, § 1220)[6] and points out that it was originally rejected in its entirety only because it

---

⁶Evidence Code section 1220 provides: "Evidence of a statement is not made inadmissible by the hearsay rule when offered against the declarant in an action to which he is a party in either his individual or representative capacity, regardless of whether the statement was made in his individual or representative capacity."

mentioned insurance. In support of its argument, Douglas urges the court erred in excluding the evidence because Evidence Code section 1155,[7] which proscribes the admission of evidence that a person was insured "to prove negligence or other wrongdoing," is not applicable in the instant case. Citing *North* v. *Vinton* (1936) 17 Cal.App.2d 214 [61 P.2d 950], Douglas argues that where an admission makes only incidental reference to insurance, "the entire statement is admissible, *not to prove the fact of insurance,* but solely because the reference to the insurance is part of the admission." (*Id.* at p. 219, italics added.)

While we have no argument with that principle, the exception set forth in *North,* and relied on by Douglas, is not here applicable. To the contrary, what Douglas was attempting to do in the court below is that which *North* forbids, namely, "to prove the fact of insurance." (17 Cal.App.2d at p. 219.) Douglas wanted to show the jury that Continental's insurance company, not Continental, is the real party in interest in this lawsuit and that, in fact, Continental disavowed any participation in its insurer's allegations of fraud or lack of safety.

The trial court correctly perceived that bringing that information before the jurors would be highly prejudicial and misleading. (Evid. Code, § 352.) The same considerations which underlie Evidence Code section 1155 require exclusion of the evidence. (See 1 Witkin, Cal. Evidence (3d ed. 1986) § 417, p. 391 ["[t]he evidence is regarded as both irrelevant and prejudicial"].)

Further, the instant lawsuit was brought only in the name of Continental; Continental's status as the real party in interest was not challenged by Douglas, although such challenge was appropriate if the insurer had paid Continental in full for its loss. (See 4 Witkin, Cal. Procedure (3d ed. 1985) Pleading, § 112, pp. 147-148.)

■ Although the trial court excluded the entire Robert Six bulletin, it ruled the last sentence of the bulletin (quoted above) would be received in evidence if Douglas could show its relevance: It could do so by producing evidence it was issued *before* Continental made the postaccident design change to remedy the landing gear defect, as recommended by Douglas in its safety bulletin.

Douglas, however, failed to carry its burden and now, on appeal, contends the court by its ruling improperly reversed the burden of the parties,

---

[7] Evidence Code section 1155 provides: "Evidence that a person was, at the time a harm was suffered by another, insured wholly or partially against loss arising from liability for that harm is inadmissible to prove negligence or other wrongdoing."

confusing admissibility with weight.[8] That contention is devoid of merit. The last sentence of the Robert Six bulletin was not relevant to impeach Continental's claim it was defrauded by Douglas, regarding the safety of the aircraft, if Continental only "continued" to believe the DC-10 was safe *after* the landing gear defect was remedied.[9] Therefore, the sentence was properly excluded absent a proper foundation.

### D. The Starlof Letter Was Properly Admitted in Evidence.

We find Douglas's argument that the trial court prejudicially erred in admitting the "Starlof letter," and the evidence associated with it, lacking in merit.

William C. Starlof, the manager of Douglas's Federal Aviation Administration (FAA) Liaison Office, sent a letter on June 4, 1971 (the Starlof letter or letter), to the Aircraft Engineering Division of the FAA. The letter was sent for the specific purpose of demonstrating to the FAA that the DC-10 was in compliance with its special condition A-4. That condition related to protection of the fuel lines in the *fuselage* in the event of an accident. Condition A-4 had to be met before the FAA would issue a "type certificate" showing the aircraft met federal air regulation standards.

In his letter, Starlof also made an evaluation of the breakaway characteristics of the aircraft's main landing gear with respect to the fuel lines and fuel tanks in the *wings.* On page two of the letter, Starlof made the following statement: "The overall effect of the failure modes described is that the landing gear will break cleanly without r[u]pturing the fuel tanks or fuel lines. In addition to the above, it should be noted that the DC-10 main landing gear and its carry-through structure is similar in design to both the DC-8 and DC-9. Laboratory failure tests on the DC-8 gear and service failures which have been experienced on the DC-8 and DC-9, *in most cases, confirm that the gear will sever cleanly from the wing without failing surrounding primary wing structure.*" (Italics added.)

Representations similar to that quoted above were made to Continental in the Douglas sales brochures and at the precontract briefings. However,

---

[8] In urging that Continental had the burden of proof on the question when the defect on Continental's fleet of DC-10's was remedied, Douglas asserts that information was particularly within the knowledge of Continental, pointing to the off-hand remark of Continental's counsel at bench that "nobody knows" when the changes to the aircraft were made. While it may be true that counsel was unable to elicit that information at trial, certainly appropriate pretrial discovery directed to that question would have produced it.

[9] We do not subscribe to Douglas's view that the last sentence of the Robert Six Bulletin characterized the DC-10 as safe "during the *entire time* Continental operated them." (Italics added.)

Continental never saw the Starlof letter until after the accident, so there was no question that Continental could not have relied on a misrepresentation in the letter when purchasing the DC-10.

■ Douglas claims the court prejudicially erred in admitting the letter in evidence because it enabled Continental to present to the jury the distorted picture that misrepresentations in the letter, regarding the breakaway characteristics of the landing gear and *wing* structure, were relied upon by the FAA in issuing its type certification for the DC-10. As Douglas correctly points out, the FAA did not have a requirement that applied to protection of the *wing* fuel tank and lines.[10] However, the FAA did have a *proposed* rule which covered that very subject, although it was not in effect when the Starlof letter was sent to the FAA. Nevertheless, Douglas's engineers testified that the challenged paragraph was inserted in the letter in an attempt by Douglas to avoid imposition by the FAA of the proposed rule because it would have imposed more rigorous fuel tank protection requirements on Douglas.

■ Douglas argues the trial court erroneously failed to require Continental to prove all the elements of Douglas's alleged fraud on the FAA—especially reliance—as preliminary facts (Evid. Code, § 403, subd. (a)(1)) prior to admitting the Starlof letter into evidence. Douglas maintains the letter was only admissible on the fraud or breach of contract issues if the court first determined the FAA relied on the alleged misrepresentations in issuing the type certificate for the DC-10. The type certificate was, of course, Continental's assurance the FAA determined the aircraft was safe.

Douglas's argument, however, overlooks the fact that the trial court stated one reason it received the letter was as *circumstantial evidence* of Douglas's fraudulent intent with respect to Continental. Under that theory, evidence of even an unsuccessful attempt by Douglas to avoid imposition by the FAA of the proposed rule is relevant circumstantial evidence of Douglas's intent to defraud Continental. And, under that theory, the FAA's reliance or lack thereof was not material to the question whether the letter was admissible.

It is well established California law that " '[s]ince direct proof of fraudulent intent is often impossible, the intent may be established by [in]ference

---

[10] The only evidence on this issue came from Leonard Williamson, a retired FAA official whose job for 35 years had been to review aircraft, including the DC-10, to see if they met FAA standards and regulations prior to the issuance of type certification. He testified the FAA would have ignored the challenged part of the letter in issuing the certificate inasmuch as federal aviation regulations in effect at the time did not require protection of the *wing* fuel tanks.

from acts of the parties.' [Citation.]"[11] (*Delos* v. *Farmers Insurance Group* (1979) 93 Cal.App.3d 642, 658 [155 Cal.Rptr. 843]; *Miller* v. *National American Life Ins. Co.* (1976) 54 Cal.App.3d 331, 338 [126 Cal.Rptr. 731]; 5 Witkin, Summary of Cal. Law, Torts, *op. cit. supra,* at § 686, p. 787.) ■ It is also settled law that if evidence is admissible for any purpose it must be received, even though it may be highly improper for another purpose. (*Daggett* v. *Atchison T. & S. F. Ry. Co.* (1957) 48 Cal.2d 655, 665 [313 P.2d 557, 64 A.L.R.2d 1283].)

However, the party against whom the evidence is offered is entitled, *upon request,* to a proper instruction limiting the purposes for which the evidence may be considered. (*Daggett* v. *Atchison. T. & S. F. Ry. Co., supra,* 48 Cal.2d at pp. 665-666; Evid. Code, § 355.) ■ Here, the trial court properly refused the limiting instruction proffered by Douglas; it was too narrow and did not correctly inform the jury of the purposes for which they could consider the Starlof letter.[12] (See *Agarwal* v. *Johnson, supra,* 25 Cal.3d at pp. 950-951; *Downing* v. *Barrett Mobile Home Transport, Inc.* (1974) 38 Cal.App.3d 519, 523 [113 Cal.Rptr. 277].) And, contrary to Douglas's assertion, the instructions the trial court gave the jury covered the material issues and controlling legal principles of the case. (See *Agarwal, supra,* at p. 951.)

■ Moreover, the trial court did not abuse its discretion in admitting the evidence. (Evid. Code, §§ 352, 353; *Kessler* v. *Gray* (1978) 77 Cal.App.3d 284, 291-292 [143 Cal.Rptr. 496].) The court's exercise of discretion will be upheld on appeal absent a clear error of law or manifest abuse (*Michail* v. *Fluor Mining & Metals, Inc.* (1986) 180 Cal.App.3d 284, 286-287 [225 Cal.Rptr. 403]) and there was neither. The record shows the judge weighed the prejudicial effect of the evidence against its probative value. (*Id.* at p. 287.) A full expression of the court's basis for excluding or refusing to exclude evidence under Evidence Code section 352 is not required. (*Ibid.*; 1 Witkin, Cal. Evidence, *op. cit. supra,* at § 303, pp. 273-274.)

---

[11] The Starlof letter was not inadmissible "other acts" evidence under the authority of *People* v. *Holt* (1984) 37 Cal.3d 436, 451 [208 Cal.Rptr. 547, 690 P.2d 1207], as Douglas contends. It was admissible under the exception of Evidence Code section 1101, subdivision (b). (See *The Atkins Corporation* v. *Tourny* (1936) 6 Cal.2d 206, 215 [57 P.2d 480]; 1 Witkin, Cal. Evidence, *supra,* at § 385, p. 359.)

[12] Douglas's proposed instruction reads as follows: "The letter from William Starloff to the Federal Aviation Administration concerning the failure mode of the landing gear was admitted into evidence solely because witness Dennis Parks received a copy of it after the accident and used it in his report. It is not evidence of a representation by McDonnell Douglas Corporation to Continental Air Lines concerning landing gear breakaway design because Continental Air Lines had not received it before it purchased the DC-10 aircraft."

E. The Trial Court Did Not Prejudicially Err in Limiting the Testimony of Douglas's Expert Witness McCarthy.

 Douglas contends the trial court prejudicially erred in refusing to permit their expert witness, John McCarthy, "to testify from documents prepared by his subordinates" or even to mention he relied on those documents in forming his opinion as to the amount of damage the aircraft would have sustained had there been no fire.

McCarthy was a Douglas employee who, for the last 25 years, worked in a department known as "Recovery and Modification Services, Product Support" (RAMS). He was the manager of the unit for 15 years. His job in RAMS was to make aircraft repair estimates based on data furnished by subordinates. McCarthy was involved in at least a dozen such estimates per year for a quarter of a century: these estimates ran into the millions of dollars.

McCarthy personally inspected the DC-10 at the site of the crash and, from his observations, determined which parts of the aircraft would have needed repair or replacement even if there had been no fire. Eventually, an attorney for Douglas asked him to estimate the cost of the impact damage had there been no fire as a result of the alleged fraud. McCarthy then requested two regular members of his staff, House and Rich, each to prepare an analysis. House's function was to identify and price the parts needed for the hypothetical job, while Rich developed the manpower figures and labor costs.

According to McCarthy, the project was a "joint effort." However, although McCarthy was shown the numbers produced by House and Rich, he testified he did not verify them nor did he "review them hard" because "[t]hey looked like they were in the ballpark." McCarthy's cost estimate was developed from the information and work sheets they gave him and it was embodied in a report, Exhibit 11,000.

Continental's counsel objected to McCarthy testifying on the basis of Exhibit 11,000, arguing that McCarthy had no personal knowledge of the facts in that report because he had not personally performed the underlying work. The trial court sustained the objection and ruled that McCarthy could not testify that he relied on the analyses by House and Rich or as to the details of Exhibit 11,000. Thus, Douglas argues McCarthy's testimony was eviscerated and rendered unpersuasive because, in the eyes of the jury,

it was based on nothing more than his viewing of the aircraft after the accident and his general experience.[13]

The questions presented here are whether McCarthy should have been allowed to testify (1) that he relied on the House-Rich cost and price data in forming his opinion on the cost of repairing the aircraft had there been no fire and (2) regarding the details of Exhibit 11,000.

Under Evidence Code section 801, subdivision (b), an expert's opinion may be "[b]ased on matter (including his special knowledge, skill, experience, training, and education) perceived by or personally known to the witness or made known to him at or before the hearing, whether or not admissible, that is of a type that reasonably may be relied upon by an expert in forming an opinion upon the subject to which his testimony relates . . . ."

On direct examination the expert may state the reasons for the opinion and the matter upon which the opinion is based, unless he is precluded by law from using such reasons or matter. (Evid. Code, § 802.) The portions of an opinion based in whole or significant part on matter that is not a proper basis therefor must be excluded upon objection, although the expert may testify to that portion of the opinion which is based on proper matter. (Evid. Code, § 803.)

Here, the analyses House and Rich compiled for McCarthy were themselves expert opinions. McCarthy based his final cost estimate for trial on those analyses, in the report designated Exhibit 11,000. Since House and Rich were not present in court to testify, however, their opinions, embodied in the report, were hearsay.

In *People* v. *Coleman* (1985) 38 Cal.3d 69, at page 92 [211 Cal.Rptr. 102, 695 P.2d 189], the Supreme Court observed that in *Grimshaw* v. *Ford Motor Co.* (1981) 119 Cal.App.3d 757, 788-789 [174 Cal.Rptr. 348], the Court of Appeal explained the current state of the law,[14] quoting from *Grimshaw* with approval as follows: " 'While an expert may state on direct examination the matters on which he relied in forming his opinion, *he may not testify as to the details* of such matters if they are otherwise inadmissible. [Citations.] The rule rests on the rationale that while an expert may give

---

[13] Douglas concedes "the evidence suppressed—$9,825,000—and the evidence given—'at least $10 million'—were consistent as to amount."

[14] Douglas's reliance on *Appel* v. *Burman* (1984) 159 Cal.App.3d 1209 [206 Cal.Rptr. 259], is misplaced. *Appel* predates *People* v. *Coleman, supra,* 38 Cal.3d 69, and to the extent its holding conflicts with *Coleman,* it is simply not California law.

reasons on direct examination for his opinions, including the matters he considered in forming them, *he may not under the guise of reasons bring before the jury incompetent hearsay evidence.* [Citation.] Ordinarily, the use of a limiting instruction[,] that matters on which an expert based his opinion are admitted only to show the basis of the opinion and not for the truth of the matter[,] cures any hearsay problem involved, but in aggravated situations, where hearsay evidence is recited *in detail,* a limiting instruction may not remedy the problem. [Citations.]' " (Italics added.)

In other words, as relevant here, while an expert may rely on inadmissible hearsay in forming his or her opinion (see *People* v. *Coleman, supra,* 38 Cal.3d at p. 90), and may state on direct examination the matters on which he or she relied, the expert may not testify as to the details of those matters if they are otherwise inadmissible (38 Cal.3d at p. 92).

For example, in *Whitfield* v. *Roth* (1974) 10 Cal.3d 874 [112 Cal.Rptr. 540, 519 P.2d 588], the expert witness neurosurgeon testified that he saw no abnormality in certain x-ray films. He then testified, over objection, that he presented the films at " 'grand rounds at Stanford' " to about 50 students, residents and faculty doctors and not one of them could see an abnormality or detect any pathology. (*Id.* at p. 894.) The Supreme Court held the testimony concerning the opinion of the other doctors who were not present in court was hearsay. (*Ibid.*) The reason was obvious. The opportunity to cross-examine the other doctors as to the basis for their opinions was denied to the adverse party.[15] (*Ibid.*)

The *Whitfield* court cited to and relied on *Frampton* v. *Hartzell* (1960) 179 Cal.App.2d 771 [4 Cal.Rptr. 427]. In *Frampton,* the court held the testimony of an expert witness psychiatrist as to the opinion of the medical staff at the hospital, where he was a supervisor-psychiatrist, was inadmissible hearsay. (*Id.* at p. 773.) The rationale for the holding was that the party to whom the testimony is adverse is denied the right of cross-examination. (*Ibid.*)

And, in *People* v. *Young* (1987) 189 Cal.App.3d 891 [234 Cal.Rptr. 819], the Court of Appeal held that psychiatric records relied on by two psychiatrist experts were inadmissible except to explain that the doctors relied on

[15]This rule is not to be confused with the limited admissibility rule of *Kelley* v. *Bailey* (1961) 189 Cal.App.2d 728, 737-738 [11 Cal.Rptr. 448]. *Kelley* held that physicians could rely on the reports of other physicians when testifying, not as independent proof of facts, but as part of the information on which the testifying physician based his own treatment or diagnosis. The court explained that, upon request, the jurors should be told that the evidence was to be considered only for that narrow and limited purpose.

the reports in reaching their conclusions regarding appellant's sanity. (*Id.* at p. 913.) The court stated the reports were hearsay and observed that "[t]he rule which allows an expert to state the reasons upon which his opinion is based may not be used as a vehicle to bring before the jury incompetent evidence." (*Ibid.*)

As the court noted in *Mosesian* v. *Pennwalt Corp.* (1987) 191 Cal.App.3d 851, at page 860 [236 Cal.Rptr. 778]: "Experts may rely upon hearsay in forming opinions. They may not relate an out-of-court opinion by another expert as independent proof of fact. [Citation.] It is proper to solicit the fact that another expert was consulted to show the foundation of the testifying expert's opinion, but not to reveal the content of the hearsay opinion."

Therefore, in accordance with the foregoing authorities, the trial court correctly ruled that McCarthy could not testify regarding the contents of the report, Exhibit 11,000, even though it was, in McCarthy's words, a "joint effort." However, the trial court erred in precluding McCarthy from testifying he relied on the cost and price figures submitted to him by House and Rich in forming his expert opinion on the cost of repairing the aircraft had there been no fire. Douglas was not prejudiced by the trial court's partially erroneous ruling.

### F. The Trial Court Did Not Prejudicially Err in Admitting the Parol Evidence Under the Fraud Exception to the Parol Evidence Rule.

■■■■ Douglas next argues that the trial court erred in admitting into evidence, over its strong objections, testimonial evidence and promotional brochures which varied and contradicted the negotiated terms of the parties' contract. Douglas urges the admission of this evidence violated the parol evidence rule, vitiated the integration clause of the parties' contract, and was unquestionably prejudicial to Douglas's cause.

The contract negotiated by the parties, by which Continental acquired its fleet of DC-10's, consists of the Purchase Agreement and letter agreements, which are two inches thick, and incorporates by precise reference the Detail Specification which contains almost another four hundred pages.

The Specification depicts, in detail, the features and configuration of the aircraft, and describes the performance characteristics of its various components. Prior to finalization of the Purchase Agreement, the Detail Specification was provided to Continental, whose engineering department reviewed it and negotiated numerous changes. In Section 32-10.03.00 of the

Specification, the parties agreed: "The main landing gear system shall be designed so that if it fails due to overloads during takeoff and landing (assuming the overloads are in the vertical plane parallel to the longitudinal axis of the aircraft), the failure mode *is not likely* to rupture the integral wing fuel tank or fuel lines." (Italics added.)

Continental never asked for any change in the carefully drawn wording of the above-quoted section.

The parties articulated their intention that the extensive, detailed contract would constitute the entirety of their agreement and would not be subject to informal alterations, waivers or embellishments in the following integration clause:

"A. This Agreement is the complete and exclusive statement of the terms and conditions of the entire agreement between the parties hereto. . . .

"B. This Agreement, and any term or condition thereof, shall not be varied, contradicted, explained or supplemented by an oral agreement or representation, by course [of] dealing or performance or by usage of trade, nor amended or changed in any other manner except by an instrument in writing of even or subsequent date hereto, executed by both parties by their duly authorized representatives."

At the beginning of the trial, Douglas moved *in limine* to preclude Continental from introducing in evidence precontract promotional sales brochures Continental received from Douglas and oral statements made by Douglas engineers and other personnel at precontract briefings on the DC-10. The court denied the motion and, based on the "fraud exception" to the parol evidence rule, held the evidence was not barred.

As a result of this ruling, at least nine sales brochures, two or three inches thick apiece, were placed before the jury. Portions of the brochures were blown up for emphasis. ▆▆ ▆▆ ▆▆ ▆▆ Witnesses were questioned at length about the contents and about representations made by Douglas's representatives at briefings which antedated finalization of the contract.[16]

---

[16] Douglas also maintains (in a footnote to its brief) that the brochures were erroneously admitted because Continental did not lay an adequate foundation for their receipt into evidence. That is not true. James Colburn, Continental's former vice-president of Engineering, who was originally in charge of the evaluation process for the DC-10, testified that he collected one of every engineering technical brochure submitted to Continental during the Douglas engineering presentations (a volume exceeding one file drawer in his office) and that he read "every one" of them. Two of the brochures were found in Continental's files in the structural engineering department; key Continental personnel recognized certain brochures; others believed they read and relied on a particular brochure in evaluating the aircraft; still

In its opening brief, Douglas complains specifically about the admission of a single sentence appearing in small print in several of the brochures, which made this *promise* for the DC-10: "The fuel tank *will not rupture* under crash load conditions." (Italics added.)

As we will explain, under California law, the admission of this particular sentence in the brochures, and testimony of like oral promises Douglas made, was error.

Code of Civil Procedure section 1856 sets forth the parol evidence rule. Subdivision (a) of that section provides: "Terms set forth in a writing intended by the parties as a final expression of their agreement with respect to such terms as are included therein *may not be contradicted* by evidence of any prior agreement or of a contemporaneous oral agreement."[17] (Italics added.)

Subdivision (b) of section 1856 provides that terms set forth in a writing "may be *explained* or *supplemented* by evidence of consistent additional terms *unless* the writing is intended also as a *complete and exclusive* statement of the terms of the agreement."[18] (Italics added.) Here, the parties did so intend. They apparently had this particular provision in mind when, in Article 20 of the Purchase Agreement, they expressly stipulated, inter alia, that the terms of the agreement could not be "varied, contradicted, *explained or supplemented* by an oral agreement or representation" and that the agreement was "the *complete and exclusive* statement of the terms and conditions of the entire agreement. . . ." (Italics added.)

---

others recalled receiving information similar to that which appeared in a brochure or recalled a representation made in a brochure; numerous Douglas witnesses testified that they used the brochures for sales campaigns and briefings and that they routinely gave them to prospective purchasers of Douglas aircraft; and, finally, portions of Continental's Tri-Jet Evaluation paraphrased representations in several of the brochures. The fact that Continental personnel received, read and relied on the brochures to evaluate and reach a decision with respect to purchasing the DC-10 may be inferred circumstantially from the totality of the evidence. (See 1 Witkin, Cal. Evidence (3d ed. 1986) § 284, pp. 253-254; § 285, pp. 254-255.) At the time of trial, approximately 15 or 16 years had passed since the DC-10 was evaluated and the contract finalized. Under these circumstances, there was more than adequate direct and circumstantial evidence that the brochures admitted in evidence were relied upon by Continental personnel in deciding to purchase the DC-10. It cannot be gainsaid that "[t]rial judges should be sensitive to the fact that a trial is a search for the truth and because of the nature of a fraud action liberality in the receipt of evidence should be indulged to a degree commensurate with the difficulties of the proof." (*Peskin* v. *Squires* (1957) 156 Cal.App.2d 240, 249 [319 P.2d 405].)

[17] Section 2202 of the California Uniform Commercial Code is identical to this provision in all material respects.

[18] Subsection (b) of section 2202 of the California Uniform Commercial Code contains essentially the same provision.

The justification for the admission of the parol evidence was the "fraud exception" to the parol evidence rule contained in subdivision (g) of section 1856, which provides in relevant part: *"This section does not exclude other evidence ... to establish illegality or fraud."*[19] (Italics added.)

But the fraud exception is not applicable where "promissory fraud"[20] is alleged, unless the false promise is independent of or consistent with the written instrument. (*Simmons v. Cal. Institute of Technology* (1949) 34 Cal.2d 264, 274-275 [209 P.2d 581]; *Newmark v. H and H Products Mfg. Co.* (1954) 128 Cal.App.2d 35, 37-38 [274 P.2d 702]; *Cobbs v. Cobbs* (1942) 53 Cal.App.2d 780, 784-786 [128 P.2d 373].) It does not apply where, as here, parol evidence is offered to show a fraudulent promise directly at variance with the terms of the written agreement. (*Bank of America etc. Assn. v. Pendergrass* (1935) 4 Cal.2d 258, 263 [48 P.2d 659]; see *Simmons v. Cal. Institute of Technology, supra,* 34 Cal.2d at pp. 274-275; *Green v. Del-Camp Investments. Inc.* (1961) 193 Cal.App.2d 479, 482 [14 Cal.Rptr. 420].)

In *Pendergrass, supra,* 4 Cal.2d 258, at page 263, the Supreme Court announced the law of California as it applies to this question: "Our conception of the rule which permits parol evidence of fraud to establish the invalidity of the instrument is that it must tend to establish some independent fact or representation, some fraud in the procurement of the instrument or some breach of confidence concerning its use, and *not a promise directly at variance with the promise of the writing.*" (Italics added.)

Here, the Detail Specification recited that (1) the landing gear "shall be designed" so that (2) under certain specified load conditions (i.e., up and aft loads), (3) failure of the landing gear "is not likely" to rupture the wing fuel tanks or fuel lines.

Therefore, the unequivocal promise in the brochures, elicited in testimony, that the wing fuel tank and fuel lines "will not rupture," varied and contradicted the qualified language of the Detail Specification. Continental's argument that the evidence of that absolute guarantee was properly admitted fails to acknowledge the existence and viability of *Pendergrass.*

---

[19] In making its ruling, the court stated: "The law in California is [that] fraudulent representations inducing the execution of a contract [are] generally admissible as an exception to the parol evidence rule, and that a party cannot contract against the effect of his own fraud."

[20] " 'A promise made without any intention of performing it' constitutes actual fraud." (*Coast Bank v. Holmes* (1971) 19 Cal.App.3d 581, 591 [97 Cal.Rptr. 30]; Civ. Code, § 1572, subd. 4.) Douglas's representation that the fuel tank "will not rupture" is properly analyzed as a form of promissory fraud. (See Sweet, *Promissory Fraud and the Parol Evidence Rule* (1961) 49 Cal.L.Rev. 877, 881, 882, 886.)

(See *Glendale Fed. Sav. & Loan Assn.* v. *Marina View Heights Dev. Co.* (1977) 66 Cal.App.3d 101, 161 [135 Cal.Rptr. 802]; *Davis* v. *Gulf Oil Corp.* (C.D.Cal. 1983) 572 F.Supp. 1393, 1400-1401.) The cases on which Continental relies do not limit or vitiate its applicability; several predate it;[21] others acknowledge its limitation on the fraud exception;[22] while in still others, the parol evidence in question was not offered to prove misrepresentations about subjects covered by the agreement.[23]

Continental's reliance on *Munchow* v. *Kraszewski* (1976) 56 Cal.App.3d 831 [128 Cal.Rptr. 762] is likewise unavailing. First, its incorrect pronouncement that "parol evidence is *always* admissible to prove fraud" (*id.* at p. 836, italics added) is dictum and, secondly, it relies on a "line of cases" (*ibid.*) which consist of (1) decisions antedating *Pendergrass,* and (2) court of appeal decisions in which the parol evidence offered was not at variance with the instruments in question (*id.* at p. 836, fn. 5).

Finally, Continental's reliance on *Cobbledick-Kibbe Glass Co.* v. *Pugh* (1958) 161 Cal.App.2d 123 [326 P.2d 197] is misplaced. The holding in *Cobbledick-Kibbe* is contrary to established California law and is factually distinguishable. The nub of the court's holding was that, inasmuch as the seller deceived the buyer by tendering a contract without warning him it contained language on the back contrary to the seller's oral representations, the seller could not use that provision to bar the buyer's fraud action in which he claimed reliance on the inconsistent oral representations. Here, unlike the buyer in *Cobbledick-Kibbe,* Continental cannot claim it was unaware of the terms of the Detail Specification or of the integration clause in the contract.

Although neither party has raised the issue, we note the *Pendergrass* rule, which precludes the admission of evidence of a false promise inconsistent with the terms of a written agreement to prove fraud, has been criticized in at least one court of appeal decision (*Coast Bank* v. *Holmes, supra,* 19 Cal.App.3d at pp. 591-592; see *Glendale Federal Savings & Loan Assn.* v. *Marina View Heights Dev. Co., supra,* 66 Cal.App.3d at p. 161) and in early

---

[21]*Simmons* v. *Ratterree Land Co.* (1932) 217 Cal. 201, 203-204 [17 P.2d 727]; *Ferguson* v. *Koch* (1928) 204 Cal. 342, 347 [268 P. 342, 58 A.L.R. 1176]; *Hunt* v. *L. M. Field, Inc.* (1927) 202 Cal. 701, 703-704 [262 P. 730]; *Mooney* v. *Cyriacks* (1921) 185 Cal. 70, 81-82 [195 P. 922].

[22]*Hartman* v. *Shell Oil Co.* (1977) 68 Cal.App.3d 240, 251 [137 Cal.Rptr. 244]; *Oak Industries. Inc.* v. *Foxboro Co.* (S.D.Cal. 1984) 596 F.Supp. 601, 607-608.

[23]*Richard* v. *Baker* (1956) 141 Cal.App.2d 857, 863 [297 P.2d 674]; *File* v. *U. S. Machinery Supply Co.* (1954) 128 Cal.App.2d 176, 179 [274 P.2d 913]; *Morris* v. *Harbor Boat Building Co.* (1952) 112 Cal.App.2d 882, 888 [247 P.2d 589].

law review articles of this state (Note (1950) 38 Cal.L.Rev. 535; Sweet, *Promissory Fraud and the Parol Evidence Rule, supra,* 49 Cal.L.Rev. 877).

More recently, the eminent Bernard E. Witkin opined in his treatise on evidence (2 Witkin, Cal. Evidence (3d ed. 1986) § 1000, pp. 946-947) that the rule may be questioned today where a party seeks fraud damages, rather than merely attempting to avoid or nullify the main agreement. Mr. Witkin expressed that view because in 1985 the California Supreme Court reversed the long-standing and analogous rule that a tort action for damages could not be based on a false promise where the promise itself was unenforceable under the statute of frauds.[24]

However, while the *Pendergrass* rule may be subject to criticism, and even questioned, it is still the law and we are bound by it (*Auto Equity Sales, Inc.* v. *Superior Court* (1962) 57 Cal.2d 450, 455 [20 Cal.Rptr. 321, 369 P.2d 937]), as was the court of appeal which criticized the rule 18 years ago in *Coast Bank* v. *Holmes, supra,* 19 Cal.App.3d at pages 591-592. (See *Glendale Fed. Sav. & Loan Assn.* v. *Marina View Heights Dev. Co., supra,* 66 Cal.App.3d at p. 161.) ▮ ▮▮▮▮ Thus, under the *Pendergrass* rule, the trial court erred in admitting evidence of Douglas's precontract promise that the wing fuel tank "will not rupture."[25]

---

[24] In *Tenzer* v. *Superscope, Inc.* (1985) 39 Cal.3d 18, 29 [216 Cal.Rptr. 130, 702 P.2d 212], the Supreme Court disapproved the then 44-year-old rule of *Kroger* v. *Baur* (1941) 46 Cal.App.2d 801, 803, that a tort action for damages could not be based on a false promise where the promise itself was unenforceable under the statute of frauds. One of the considerations of the Supreme Court which pointed to the " 'demise of the *Kroger* rule' " (39 Cal.3d at p. 29) was " 'Comment (c) to section 530 of the Restatement Second of the Law of Torts [which] states that a misrepresentation of one's intention is actionable [fraud] even "when the agreement is oral and made unenforceable by the statute of frauds, or *when it is unprovable and so unenforceable under the parol evidence rule.*" ' " (39 Cal.3d at p. 29, italics added; see 5 Witkin, Summary of Cal. Law, Torts, *op. cit. supra,* at § 687, pp. 788-789 & § 688, pp. 789-790.)

[25] Evidence of Douglas's promise in its sales brochures, that "[t]he main landing gear will be tested on the full-scale wing, etc., fuselage specimen to demonstrate the fail-safe integrity of the landing gear attaching structure and wipe-off characteristics of the landing gear design," was not barred by the parol evidence rule. That promise does not vary or contradict section A.(1) of Article 10 of the Purchase Agreement which covers the subject. (*Bank of America etc. Assn.* v. *Pendergrass, supra,* 4 Cal.2d at p. 263.) The test is within the category of bargained-for flight tests "to demonstrate compliance with the performance guarantees set forth in the Detail Specification." (Art. 10, § A.(1).) Thus, it is consistent with the matters covered by the agreement. *Coast Bank* v. *Holmes, supra,* 19 Cal.App.3d at p. 591; *Simmons* v. *Cal. Institute of Technology, supra,* 34 Cal.2d at p. 274.)

Likewise, the representation by Douglas in its sales brochures regarding the "successful DC-8 and DC-9 design experience" was not barred by the parol evidence rule, as it is an independent representation, not a promise directly at variance with the terms of the contract. (*Bank of America etc.* v. *Pendergrass, supra,* 4 Cal.2d at p. 263.)

■■■ Douglas argues it was prejudiced by the court's error in admitting that evidence because its effect was to permit Continental to parlay the qualified ("not likely") contract language it had negotiated into an absolute guarantee that the fuel tank rupture would never occur and to argue to the jury that since it did, Douglas must have committed a species of fraud.

The question we must answer then is whether the erroneous admission of Douglas's precontract promise requires a reversal of this cause. If the single sentence to which Douglas directs our attention were the only representation on the subject of gear breakaway and wing fuel tank rupture emphasized by Douglas in examining witnesses, and in closing argument, we might be persuaded by Douglas's claim of prejudice. However, it was not. Continental gave at least the same attention and emphasis to several similar representations which appeared in many of the brochures. Those other representations were *factual,* and thus admissible under the fraud exception to the parol evidence rule, for reasons which we explain below. The following are examples:

"The structure is designed and tested for crashworthiness. The landing gear, flaps, and *wing engines/pylons are designed for wipe-off without rupturing the wing fuel tank or fuselage shell structure.*" (Italics added.)

and

"These multiple load paths [on the wing] *are designed* to provide strength greater than that of the gear itself *in order to prevent rupture of the fuel tank* in the event of impact with some obstacle during landing and taxiing." (Italics added.)

and

"Under crash loading conditions, the main landing gear *is designed* to break away from the wing structure *without rupturing fuel lines or the integral wing fuel tank.*" (Italics added.)

and

"The [wing] support structure *is designed* to a higher strength than the gear *to prevent fuel tank rupture* due to an accidental landing gear overload." (Italics added.)

In its supplemental post-oral-argument brief, Douglas urges that the four representations quoted, *supra,* are also inadmissible parol promises of future performance, not admissible factual representations, because the aircraft

was "to be delivered in the future" and "Continental clearly understood that at the time . . . the brochures [were] distributed, the aircraft was still in the design stage."

Douglas's argument fails, however, to acknowledge that one of Continental's main theories of the case was that when these precontract representations were made, there was in fact *no such design* in place with respect to the landing gear's breakaway feature;[26] i.e., there was never a written directive to accomplish such a design; Douglas's engineers never agreed on a description of how the gear was to fail safely; and the many separate groups and departments at Douglas, responsible for the design, never met and never coordinated a design approach or concept with respect to the breakaway feature. (When the contract was entered two or three years later, its incorporated Design Specification notably provided instead that "[t]he main landing gear *shall be designed* so that if it fails . . . the failure mode is not likely to rupture the integral fuel tank or fuel lines.")

Therefore, the four representations from the brochures, quoted *supra,* which unequivocally announced that the landing gear breakaway design was then a fait accompli, were admissible as factual representations by Douglas to Continental that it had already accomplished its safety-oriented design for that particular feature of the aircraft.[27] That evidence was properly considered by the jury on each of Continental's relevant theories of fraud.

All the representations from the brochures pertaining to the breakaway feature of the DC-10, quoted *supra,* were read to the jury in Continental's closing argument. Counsel did not unduly emphasize the single promissory representation from Douglas's brochures which, as we discussed, was admitted in error. Further, that promise was less the subject of inquiry during Continental's examination of witnesses than were the other representations about the breakaway feature.

Thus, we must conclude, after an examination of the entire record, that the challenged evidence of promissory fraud was merely *cumulative* of other properly admitted evidence on that subject; consequently, its admission was not prejudicial to Douglas's cause. (Cal. Const., art. VI, § 13; *Kalfus* v. *Fraze* (1955) 136 Cal.App.2d 415, 423 [288 P.2d 967]; 9 Witkin, Cal. Proce-

---

[26] With respect to the contract claim only, the parties stipulated that the main landing gear, a "covered component," was designed in April 1969 for purposes of determining whether that covered component had a design defect in view of the then-existing state of the art.

[27] We have considered the other issues raised in Douglas's post-oral-argument supplemental brief and find them equally lacking in merit.

dure, Appeal, *op. cit. supra*, at § 338, pp. 345-346.) There was here no miscarriage of justice. (*Ibid.*)

### G. The Precontract Promotional Materials Can Form the Basis of Continental's Fraud Claims.

■■■ Douglas's contention that the precontract promotional brochures cannot form the basis for a fraud claim is devoid of merit.[28]

First, Douglas argues that "[t]he Uniform Commercial Code and cases interpreting it have recognized that general promotional observations of this type are merely expressions of opinion that are not actionable as express warranties nor as 'fraudulent statements.' " With respect to Continental's fraud claims, the only causes of action with which we are now concerned, the cases cited by Douglas do not support its argument.

The alleged false representations in the subject brochures were not statements of "opinion" or mere "puffing." They were, in essence, representations that the DC-10 was a safe aircraft. (*Hauter* v. *Zogarts* (1975) 14 Cal.3d 104, 111-112 [120 Cal.Rptr. 681, 534 P.2d 377, 74 A.L.R.3d 1282].) In *Hauter,* the Supreme Court held that promises of safety are not statements of opinion—they are "representations of fact." (*Ibid.*; *Keith* v. *Buchanan* (1985) 173 Cal.App.3d 13, 21-22 [220 Cal.Rptr. 392].)

Next, Douglas urges that the statements in the brochures are not actionable because they are not express warranties under Commercial Code section 2313 and, further, "they were effectively disclaimed by the parties' contract." The point Douglas is apparently making with respect to the fraud claims is that the integration clause of the parties' contract bars any representations in the brochures which are at variance with their negotiated agreement.

We do not accept Douglas's argument, because to do so would be to nullify Code of Civil Procedure section 1856, subdivision (g), the fraud exception to the parol evidence rule, which specifically allows evidence of representations which contradict or vary the terms of a contract in order to establish fraud. The integration clause has no effect on the fraud exception to that rule. (2 Witkin, Cal. Evidence, *op. cit. supra,* at § 972, pp. 918-919.) "Such evidence does not contradict the terms of an effective integration since it shows that the purported instrument has no legal effect." (*Id.* at § 997, p. 944.)

---

[28] For that reason, and for reasons which become apparent in the following sections, we need not discuss whether Douglas's representation in the Detail Specification itself was false.

### H. There Is Substantial Evidence That Douglas's Misrepresentations Regarding Landing Gear Breakaway Were Material and That Continental Reasonably Relied on Them in Deciding to Purchase the DC-10.

Douglas contends in its opening brief that there was no substantial evidence that its precontract representations were *material* or that Continental reasonably *relied* on them in deciding to purchase the DC-10.

"When a finding of fact is attacked on the ground that there is not any substantial evidence to sustain it, the power of an appellate court begins and ends with the determination as to whether there is any substantial evidence, contradicted or uncontradicted, which will support the finding." (*Mother Lode Bank* v. *General Motors Acceptance Corp.* (1975) 46 Cal.App.3d 807, 810-811 [120 Cal.Rptr. 429].) In assessing the sufficiency of the evidence, we must view the evidence in the light most favorable to the judgment, drawing all reasonable inferences and disregarding all contradictory evidence. (*Campbell* v. *Southern Pacific Co.* (1978) 22 Cal.3d 51, 60 [148 Cal.Rptr. 596, 583 P.2d 121].)

Here, the evidence is overwhelming that Douglas's representations, that the landing gear were designed to break away from the wing without rupturing the wing fuel tank (as quoted in section F, *supra*), were *material* and Continental justifiably *relied* on them.

The materiality of the representations can hardly be questioned. Any airline shopping for aircraft to service its customers naturally searches for planes that are safe. (Cf. *Hauter* v. *Zogarts, supra,* 14 Cal.3d at p. 113.)

While it is true, as Douglas urges, that to sustain its fraud verdict, Continental was required to demonstrate that those representations were of such *materiality* that the contract would not have been entered without them (*Adkins* v. *Wyckoff* (1957) 152 Cal.App.2d 684, 689 [313 P.2d 592]), it is equally true that they "need not be the sole cause of damage" (*Vasquez* v. *Superior Court* (1971) 4 Cal.3d 800, 814, fn. 9 [94 Cal.Rptr. 796, 484 P.2d 964, 53 A.L.R.3d 513]; *Wennerholm* v. *Stanford Univ. Sch. of Med.* (1942) 20 Cal.2d 713, 717 [128 P.2d 522, 141 A.L.R. 1358]).

Further, *reliance* is also established "where the representation substantially influenced [the] choice, even though other influences operated as well." (5 Witkin, Summary Cal. Law, Torts, *op. cit. supra,* at § 711, p. 811; see BAJI No. 12.51.) Thus, Douglas's argument, that Conti-

nental must prove a clean landing gear breakaway was a sine qua non of its decision to purchase the DC-10, rather than the L-1011, must fail.

■■■ Moreover, it is not necessary to show reliance upon false representations by direct evidence. (*Vasquez* v. *Superior Court, supra,* 4 Cal.3d at p. 814.) " 'The fact of reliance upon alleged false representations may be inferred from the circumstances attending the transaction which oftentimes afford much stronger and more satisfactory evidence of the inducement which prompted the party defrauded to enter into the contract than his direct testimony to the same effect.' [Citations.]" (*Ibid.*) In fact, where representations have been made in regard to a material matter and action has been taken, in the absence of evidence showing the contrary, reliance on the representations will be presumed. (*Ibid.*)

■■■ Here, both materiality and reliance are demonstrated by the fact that Continental evaluated the DC-10 breakaway design in its "Tri-Jet Evaluation," which compared the DC-10 with the L-1011 for the purpose of deciding which aircraft to purchase. Douglas was the only possible source for the information; there was no way Continental could independently investigate or analyze the adequacy of that design.

An examination of the Tri-Jet Evaluation shows that, in evaluating the DC-10, Continental's engineers followed virtually the exact format set forth in a Douglas briefing memorandum.[29] Donald DuPont, the Continental engineer who evaluated the aircraft's structures, recalls using Douglas brochures to prepare the DC-10 main landing gear evaluation. The wording of portions of the Tri-Jet Evaluation was the same as, or similar to, that in many of the brochures.

In fact, under the heading "Main Landing Gear Support," the Continental engineers simply paraphrased the description from Douglas's brochures in its evaluation: ". . . Multiple load paths are provided for fail safe capa-

---

[29]

| MDC Presentation Outline | Continental Evaluation |
| --- | --- |
| General Features/ Design Philosophy | General Features/ Design Philosophy |
| Body | Fuselage Structure |
| Engine Supports | Engine Supports |
| Wing | Wing Structure |
| Tail | Tail Structure |
| Flight Controls | Flight Control Systems |
| Doors | Doors |
| Stairs | |
| Windows | Windows |

bility. The wing structure is stronger than the main landing gear to prevent fuel tank rupture in the event of a crash induced gear 'wipe-off.' "

Numerous witnesses testified that Douglas made oral presentations to Continental regarding the DC-10 structure and landing gear design and provided Continental personnel with the promotional sales brochures.

Martin Taylor, Continental's vice-president responsible for the DC-10 evaluation, said Continental asked for and received assurances that if the plane went off the runway, no fire would result from landing gear failure. He recalled that during numerous briefings, Douglas represented that the gear was designed to break away without rupturing the fuel tank. He said that was a very important subject to Continental.

Richard Adams, Taylor's superior, reviewed and relied on the Tri-Jet Evaluation in determining the DC-10 was a safe airplane. He testified that had he been told by his subordinates that the DC-10 gear was not designed to break away without rupturing the fuel tank, he would "definitely not" have recommended that Continental purchase the aircraft. Alexander Damm, Adams's superior, and the President of Continental, said the technical evaluation of the two planes was very important to him in deciding which aircraft to purchase. He, too, would not have recommended an aircraft he did not believe to be safe.

The foregoing evidence provides more than substantial evidence that Continental *relied* on Douglas's representations regarding landing gear breakaway in choosing to purchase the DC-10 and that those representations were *material.*

Douglas next argues, however, that if Continental did so rely, its reliance was unreasonable and unjustified as a matter of law. In support of that argument, Douglas points to the qualified language on the subject of landing gear breakaway in the parties' negotiated contract and the contract's integration clause which recited that the Purchase Agreement contained the complete statement of the terms between the parties.

Douglas's reasoning, however, ignores the clear mandate of our legislature that, when fraud is alleged, the parol evidence rule does not apply, and evidence of precontract representations which vary or contradict the terms of an integrated contract are admissible. (Code Civ. Proc., § 1856, subd. (g); 2 Witkin, Cal. Evidence, *op. cit. supra,* at § 972, pp. 918-919.)

The theory of the exception is that such evidence does not contradict the terms of an effective integration, since it shows the purported instrument has no legal effect. (2 Witkin, Cal. Evidence, *op. cit. supra,* at § 997, pp. 944-

945.) While we acknowledge that the exception renders the bargain of the parties and the integration clause of their contract meaningless, our acceptance of Douglas's argument would nullify the fraud exception to the parol evidence rule which has been a part of California statutory law since the Code of Civil Procedure was adopted in 1872. That we cannot do; we must obey the mandate of our Legislature.

■ Finally, Douglas appears to argue in its reply brief, both with respect to representations in the Design Specification and the brochures, that there is no substantial evidence of a "knowing or reckless misrepresentation." We disagree. ■ Fraudulent intent may be established by inference from the circumstances and the acts of the parties. (*Miller* v. *National American Life Ins. Co., supra,* 54 Cal.App.3d at p. 338; see *Delos* v. *Farmers Insurance Group, supra,* 93 Cal.App.3d at p. 658.)

■ Here, Douglas's sales brochures contain representations which amount to absolute, unqualified guarantees that the landing gear "is" or "are" designed to break away without rupturing the wing fuel tanks. However, the contract's Design Specification states the landing gear "shall be designed" so that under certain specified conditions the landing gear "is not likely" to rupture the wing fuel tanks. By that language Douglas revealed that even at that later date, when the contract was executed, there was still no design yet in place which would warrant an absolute guarantee regarding the breakaway characteristics of the landing gear.

Although the record is replete with evidence of fraudulent intent, that fact standing alone supports a finding that Douglas was, at the least, reckless in making representations to Continental, in its sales brochures and briefings, that the landing gear was designed to break away without rupturing the wing fuel tanks. Certainly Douglas's sales representatives should have known whether a particular feature of the aircraft Douglas was promoting with such vigor was already designed or was still being designed (so that its performance was yet uncertain).

"[F]alse representations made recklessly and without regard for their truth in order to induce action by another are the equivalent of misrepresentations knowingly and intentionally uttered." (*Yellow Creek Logging Corp.* v. *Dare* (1963) 216 Cal.App.2d 50, 55 [30 Cal.Rptr. 629].) Therefore, there is substantial evidence of the requisite intent for intentional fraud. *A fortiori,* there is also substantial evidence of the intent required for negligent misrepresentation.

For the foregoing reasons we conclude the evidence supports the jury's findings of liability on either or both of those theories of fraud.

## I. The Trial Court's Treatment of the Service Life Policy Claim Did Not "Poison" the Entire Lawsuit.

Douglas contends the trial court erred in submitting to the jury Continental's claim based on the Service Life Policy and in vague terms complains "prejudicial admission of documents and testimony relating to this spurious issue poisoned the entire lawsuit. . . ."

Douglas's only specific complaint, however, is that its postaccident "Service Bulletins" regarding landing gear modification, admitted on the "spurious" contract claim to show a design defect, were improperly considered by the jury on the fraud claims, inasmuch as the trial court refused its requests for an instruction that the bulletins could not be considered "in determining whether Douglas committed negligent misrepresentation or fraud." (See Evid. Code, § 1151.)

The record shows, however, that Douglas did not object to the admission of one of the bulletins in evidence and did not request a limiting instruction when either bulletin was admitted. The bulletins were admissible not only to show notice and a defect with respect to the contract claim, but were also admissible, and could properly be considered by the jury, on the factual question pertaining to Douglas's statute of limitations defense to the fraud and negligent misrepresentation causes of action.

Thus, while the trial court may have erred in refusing Douglas's requested limiting instructions, this court cannot say the jury's consideration of those bulletins with respect to Continental's fraud theories so prejudiced Douglas's case that there was here a miscarriage of justice. (Cal. Const., art. VI, § 13.)

## J. The Jury Was Properly Instructed That the Measure of Damages for Fraud Is the Market Value of the Aircraft.

Douglas argues the trial court erred in instructing the jury on the measure of damages for fraud. Specifically, Douglas complains the trial court permitted Continental to recover the market value of the aircraft under a "benefit-of-the-bargain" theory, whereas the damages should properly have been measured by the "out-of-pocket" rule.

According to Douglas, the proper measure of damages in fraud actions involving the sale of property is "explicitly and exclusively" set forth in

Civil Code section 3343 as "the difference between the actual value of that with which the defrauded person parted and the actual value of that which he received"—the "out-of-pocket" rule—plus additional damages arising out of the particular transaction, as detailed in subdivisions (a) (1) through (4).

The court, however, instructed the jury that Continental could recover as damages the *market value* of the aircraft at the time of the accident, less the amount of damages from causes other than the fraud, and less the value of the parts salvaged. Douglas maintains the court's damage formula used a benefit-of-the-bargain measure which improperly allowed Continental to use its fraud cause of action to recover contractual-type expectations damages which Civil Code section 3343 forbids.

Thus, Douglas raises two questions: (1) Does Civil Code section 3343 set forth the *exclusive* (out-of-pocket) measure of damages for fraud actions and (2) in such actions, is the out-of-pocket rule the only measure of damages which may be applied? We answer both questions in the negative for reasons we explain below.

In *Stout* v. *Turney* (1978) 22 Cal.3d 718 [150 Cal.Rptr. 637, 586 P.2d 1228], which involved an action for fraud in the sale of *real estate,* the Supreme Court, while discussing a damages question under Civil Code section 3343, unequivocally acknowledged the 1963 enactment of the California Uniform Commercial Code, "which in section 2721[30] permitted full 'benefit-of-the-bargain' recovery to defrauded persons subject to its provisions." (22 Cal.3d at p. 726, fn. omitted.)[31] Here, Douglas's sale of the DC-

---

[30] California Uniform Commercial Code section 2721 provides in pertinent part: "Remedies for material misrepresentation or fraud include all remedies available under this division for nonfraudulent breach. . . ."

[31] A benefit-of-the-bargain measure of recovery is also appropriate under Civil Code section 3343. Douglas relies on *Bagdasarian* v. *Gragnon* (1948) 31 Cal.2d 744, 762 [192 P.2d 935], in which the Supreme Court held that section 3343 requires the *exclusive* use of the out-of-pocket rule as a measure of damages for fraud. However, Douglas ignores the holding of *Ward* v. *Taggart* (1959) 51 Cal.2d 736 [336 P.2d 534], in which the *Bagdasarian* rule was modified when the court, in order to achieve a just result, refused to limit recovery to plaintiff's out-of-pocket loss. Thereafter, in *Coleman* v. *Ladd Ford Co.* (1963) 215 Cal.App.2d 90 [29 Cal.Rptr. 832], the Court of Appeal created a new exception to the *Bagdasarian* interpretation of section 3343, relying on the Supreme Court's departure from the out-of-pocket rule in *Ward.* In *Coleman,* the court declared fraud damages could be recovered under an alternative and cumulative " 'loss of bargain' rule." (*Id.* at pp. 93, 94; cited in *Stout* v. *Turney, supra,* 22 Cal.3d at p. 726; see *Hartman* v. *Shell Oil Co.* (1977) 68 Cal.App.3d 240, 246-247 [137 Cal.Rptr. 244].) "Both *Ward* and *Coleman* evidence the courts' concern over the mechanical application of the 'out of pocket' rule required by the *Bagdasarian* interpretation of section 3343." (Notes (1964) 11 UCLA L.Rev. 859, 884.)

10 fleet to Continental was clearly governed by the provisions of the California Uniform Commercial Code.

In its opinion, the *Stout* court noted the Legislative Counsel's comment to section 2721 in which counsel observed that the purpose of the section, " 'according to the [California Uniform Commercial Code] comments, is to make the remedy of buyer or seller where there is fraud as broad as, and coextensive with, the remedies where fraud is absent [and that the] section would perhaps[32] change the rule of Civil Code § 3343 stating the so-called "out-of-pocket" rule . . . and substitute or permit the so-called "loss of bargain" rule . . . .' [Citation.]" (22 Cal.3d at pp. 726-727, fn. 10.)

The *Stout* court also cited (at pp. 726-727) to a law review comment, *Deceit Damages in California: Old Problem—New Departure?* (1974) 14 Santa Clara Law. 325, 345-347, which stated: "The adoption of the Uniform Commercial Code in California further complicated the tangle of rules for fraud damages. *California Commercial Code section 2721 allows defrauded persons to secure the benefit of their bargain.* The provision was intended to equalize the remedy of buyer or seller in fraud and breach of warranty cases. California's 'out-of-pocket' statute [Civ. Code, § 3343] was not repealed despite its sharp conflict with the Commercial Code."[33] (*Id.* at p. 347, italics added, fns. omitted.)

And, Bernard E. Witkin, in his treatise on Torts (6 Witkin, Summary of Cal. Law (9th ed. 1988) Torts, § 1441, p. 916), lists California Uniform Commercial Code section 2721 as an *exception* to the out-of-pocket rule of Civil Code section 3343, noting "[t]he purpose of [section 2721] is to give the defrauded buyer of goods the same remedies as those specified for breach of warranty, and therefore in a proper case *to give him the benefit of his bargain.*"[34] (Italics added.)

---

[32] Douglas, pointing to the words "would perhaps" in the Legislative Counsel's comment to section 2721, argues the comment is mere speculation. However, the court's acknowledgment, 15 years after this state's adoption of the Uniform Commercial Code, that section 2721 permits full benefit-of-the-bargain recovery to persons subject to its provisions (22 Cal.3d at p. 726), now removes any doubt as to the effect of that section.

[33] Other law review articles of this state also suggest that section 2721, rather than Civil Code section 3343, governs when the fraudulent transaction involves the purchase of goods. (See, e.g., Sebert, *Punitive and Nonpecuniary Damages in Actions Based Upon Contract: Toward Achieving the Objective of Full Compensation* (1986) 33 UCLA L.Rev. 1565, 1601, fn. 127; Hurd & Bush, *Unconscionability: A Matter of Conscience for California Consumers* (1973) 25 Hastings L.J. 1, 27-28, fn. 151.)

[34] Douglas nonetheless maintains that principles of statutory construction lead to the conclusion that Civil Code section 3343 supersedes California Uniform Commercial Code section 2721. Relying on *Fuentes v. Workers' Comp. Appeals Bd.* (1976) 16 Cal.3d 1, 7 [128 Cal.Rptr. 673, 547 P.2d 449], it argues that the provisions of two different codes dealing with

The appropriate remedy for this case is contained in California Uniform Commercial Code section 2714, subdivision (2), which provides: "The measure of damages for breach of warranty is the difference *at the time and place of acceptance* between the value of the goods accepted and the value they would have had if they had been as warranted, *unless special circumstances show proximate damages of a different amount.* " (Italics added.)

In comment number three of the Uniform Commercial Code comments to section 2-714, it is noted that "[s]ubsection (2) describes the usual, standard and reasonable method of ascertaining damages in the case of breach of warranty but it is not intended as an exclusive measure. . . ."

For example, in *Harlan* v. *Smith* (Ala.Civ.App. 1986) 507 So.2d 943, 945, the court held a party's use of a product for a period of time after sale without notice of a defect constituted "special circumstances" which took the case out of the "time and place of acceptance" provisions of section 2-714, subdivision (2). Therefore, the party who lacked notice needed to prove the value of the item at the time of the effective discovery of the defect rather than its value at the date of acceptance. (*Ibid.*)

Most analogous to the instant matter are cases which involve breach of a warranty of title, where the purchaser used the goods for a period of time without any notice of defective title and, after discovery of the defect, is completely dispossessed of the item. In those cases, too, the courts have found special circumstances which take the case out of the time and place of acceptance provisions of section 2714. They hold the correct measure of damages is the value of the product at the time the buyer effectively lost

---

the same subject matter must be regarded as a single statute and harmonized to the extent possible. According to Douglas's argument, if they cannot be reconciled, the later statute controls. Pointing to the 1971 amendment to section 3343, Douglas argues that section 3343 is the later and controlling statute, inasmuch as the Commercial Code was adopted earlier, in 1963. We are not persuaded.

The rule of statutory construction most relevant here was stated by our Supreme Court in *People* v. *Gilbert* (1969) 1 Cal.3d 475, at page 479 [82 Cal.Rptr. 724, 462 P.2d 580], as follows: " 'It is the general rule that where the general statute standing alone would include the same matter as the special act, and thus conflict with it, the special act will be considered as an exception to the general statute whether it was passed before or after such general enactment.' "

Here, Civil Code section 3343 is a general statute which provides the measure of damages when a party has been defrauded in the purchase, sale or exchange of all manner of property. In contrast, California Uniform Commercial Code section 2721 is a special statute which provides remedies for fraudulent transactions involving solely consumer goods. Therefore, under the rules of statutory construction, section 2721 is the controlling statute.

possession and use of it, not the price of the item at the time of sale. (See, e.g., *City Car Sales, Inc.* v. *McAlpin* (Ala.Civ.App. 1979) 380 So.2d 865, 868, cert. den. (Ala. 1980) 380 So.2d 869; *Schneidt* v. *Absey Motors, Inc.* (N.D. 1976) 248 N.W.2d 792, 798; *De Weber* v. *Bob Rice Ford, Inc.* (1979) 99 Idaho 847 [590 P.2d 103, 105]; *Ricklefs* v. *Clemens* (1975) 216 Kan. 128 [531 P.2d 94, 99]; *Metal Craft, Inc.* v. *Pratt* (1985) 65 Md.App. 281 [500 A.2d 329, 336-337]; *Canterra Petro.* v. *Western Drill. & Min.* (N.D. 1987) 418 N.W.2d 267, 275; see also Annot., Measure of Damages in Action for Breach of Warranty of Title to Personal Property under UCC § 2-714 (1979) 94 A.L.R.3d 583.)[35]

██ ██ ██ Here, special circumstances take this case out of the time and acceptance provisions of section 2714 and require the measure of damages to be the market value of the aircraft at the time Continental effectively lost use of it, namely, on the date of the accident.[36] However, inasmuch as Continental was able to sell the salvageable parts, that amount was properly subtracted from Continental's damages. So, too, any damage to the aircraft from the impact alone was not chargeable to Douglas.

Therefore, the instruction to the jury, to measure Continental's fraud damages by subtracting from the market value of the aircraft, at the time of the accident, the value of the salvageable parts and the amount of damages due to the impact alone, was in all respects correct.[37]

### K. Prejudgment Interest May Be Awarded at No More Than 7 Percent Per Annum.

In its Consolidated Final Judgment, the trial court awarded Continental prejudgment interest on the $17 million fraud verdict and the $13.4 million contract verdict "at the rate of 7 percent per annum from March 1, 1978, until January 1, 1983, and at 10 percent per annum thereafter until January

---

[35] In a case decided before the 1935 enactment of Civil Code section 3343, and during the period when California subscribed to the benefit-of-bargain rule in fraud cases, the Supreme Court observed that the "measure of damages which a person is ordinarily entitled to recover in an action for deceit in the sale of property is the difference between the actual value of the property and its value had the property been as represented, and that the measure of recovery is not affected by the price paid." (*Hines* v. *Brode* (1914) 168 Cal. 507, 510 [143 P. 729]; 6 Witkin, Summary of Cal. Law, Torts, *op. cit. supra,* at § 1441, pp. 914-915.)

[36] With respect to trespass and other tortious injury to personal property, "[i]f the property is wholly destroyed, the usual measure of damages is its *market value.*" (6 Witkin, Summary of Cal. Law, Torts, *op. cit. supra,* at § 1453, p. 927, italics in original.)

[37] Contrary to Douglas's contention, this formulation of Continental's damages remedy does not include a recovery for lost profits, which Continental waived at trial.

30, 1986." Douglas correctly asserts the 10 percent prejudgment interest awards in the judgment were improper.

In *Pacific-Southern Mortgage Trust Co.* v. *Insurance Co. of North America* (1985) 166 Cal.App.3d 703, 716-717 [212 Cal.Rptr. 754], citing article XV, section 1, of the California Constitution, the court held that "[i]n the absence of any legislative act to the contrary, the rate of prejudgment interest is 7 percent," and reduced the trial court's prejudgment interest award from 10 percent to 7 percent. (Accord, *Northrop Corp.* v. *Triad Intern. Marketing S.A.* (9th Cir. 1988) 842 F.2d 1154, 1155, fn. 2; *Stan Lee Trading, Inc.* v. *Holtz* (C.D.Cal. 1986) 649 F.Supp. 577, 583.)

■ Since there is no relevant legislative act specifying a rate of prejudgment interest for a fraud claim,[38] the constitutional 7 percent rate applies and the judgment must be modified accordingly.

## II. *The Service Life Policy Claim*

Inasmuch as the fraud judgment must be upheld, as modified, we need not discuss Douglas's contentions regarding the alternative judgment on the jury's award for breach of the Service Life Policy.

## DISPOSITION

The judgment is modified to reflect an award of prejudgment interest in the amount of $9,549,750, calculated at the rate of 7 percent per annum from March 1, 1978, until January 30, 1986.[39] As so modified, the judgment is affirmed.

---

[38] There was no statutory enactment providing for a rate of prejudgment interest until 1985. In that year, the legislature added subdivision (b) to section 3289 of the Civil Code, effective January 1986. (Stats. 1985, ch. 663, § 1, p. 2251.) As amended in 1986 (Stats. 1986, ch. 176, § 1, eff. June 23, 1986), that subdivision provides as follows: "If a contract entered into after January 1, 1986, does not stipulate a legal rate of interest, the obligation shall bear interest at a rate of 10 percent per annum after a breach."

[39] The formula for calculating prejudgment interest is: principal $\times$ rate of interest $\times$ number of days interest accrued $\div$ 360.

The parties are to bear their own costs on appeal.

Spencer, P. J., and Hanson, J., concurred.

A petition for a rehearing was denied January 5, 1990, and appellant's petition for review by the Supreme Court was denied March 22, 1990.